## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| OREGONIANS FOR FLOODPLAIN PROTECTION; OREGON HOME BUILDERS ASSOCIATION; and NATIONAL ASSOCIATION OF HOME BUILDERS; | |
| Plaintiffs; | Case No. |
| v. | |
| THE U.S. DEPARTMENT OF COMMERCE, a department of the United States of America; WILBUR L. ROSS, in his capacity as the Secretary of Commerce; THE NATIONAL MARINE FISHERIES SERVICE, an agency of the United States of America, SAMUEL D. RAUCH, III, in his capacity as Acting Assistant Administrator for National Marine Fisheries Service, THE FEDERAL EMERGENCY MANAGEMENT AGENCY, an agency of the United States of America, and ROBERT FENTON, in his capacity as Acting Administrator for the Federal Emergency Management Agency; | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.     INTRODUCTION

1.     This case arises from the U.S. Department of Commerce, National Oceanic and

Atmospheric Administration ("NOAA"), National Marine Fisheries Service's ("NMFS")

issuance of the *Endangered Species Act (ESA) Section 7(a)(2) Jeopardy and Destruction or*

*Adverse Modification of Critical Habitat Biological Opinion and Section 7(a)(2) "Not Likely to*

*Adversely Affect" Determination for the Implementation of the National Flood Insurance*

*Program in the State of Oregon* (the "Biological Opinion"), and the U.S. Department of Homeland Security, Federal Emergency Management Agency's ("FEMA") implementation of the Reasonable and Prudent Alternative ("RPA").

2.      The Biological Opinion erroneously concludes, without adequate analysis or support, that FEMA's implementation of the National Flood Insurance Program ("NFIP") in Oregon is likely to jeopardize the continued existence of 16 Endangered Species Act ("ESA")-listed anadromous fish species and Southern Resident killer whales, and is likely to result in the destruction or adverse modification of designated or proposed critical habitat for the 16 anadromous fish species.  The Biological Opinion contains an equally erroneously six element RPA to FEMA's proposed implementation of the NFIP.  16 U.S.C. §§ 1531-1544.

3.      FEMA has begun implementing the Biological Opinion's erroneous RPA, beginning with Element 1 (notice to NFIP participating communities) and Element 2 ("Interim Measures").  There is nothing in the NFIP's existing statutory authority or regulations, however, that authorize FEMA to implement the RPA as issued.  Instead, FEMA is relying on a revised interpretation of a pre-existing NFIP regulation, 44 C.F.R. § 60.3(a)(2).  FEMA has revised its interpretation of this regulation to require NFIP participating communities to demonstrate that floodplain development applicants obtain some form of "ESA permit" or otherwise comply with the ESA as a condition of issuing a floodplain development permit (hereinafter the "de facto amendment"). FEMA will permit NFIP participating communities in Oregon to demonstrate compliance with this new requirement by implementing the RPA, beginning with Element 2. This new directive from FEMA to NFIP participating communities relies on a substantive change in position regarding 44 C.F.R. § 60.3(a)(2), which was adopted without following the rulemaking procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-

706, 3105, 3344, 5372, 7521, § 553, and without analysis of environmental impacts required by National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m-12.

4.      Plaintiffs seek a declaration that the Biological Opinion, including the RPA, which directs FEMA to change its implementation of the NFIP not only in Oregon, but nationwide, violates the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). Plaintiffs further seek an injunction directing NMFS to withdraw the Biological Opinion, including the RPA.  Such relief is necessary to ensure that changes to the NFIP proposed by NMFS and implemented by FEMA in Oregon and nationwide are not required without a complete and reasoned analysis of the actual impacts of the NFIP on ESA-listed species and their designated critical habitat.

5.      Plaintiffs seek a declaration that FEMA's de facto amendment of 44 C.F.R. § 60.3(a)(2) and implementation of the RPA without completing the pre-requisite rulemaking and NEPA review violates the APA because they are in excess of FEMA's jurisdiction and authority and have been undertaken without observance of requisite procedure.  5 U.S.C. § 706. Plaintiffs further seek an injunction directing FEMA to suspend any further implementation of its de facto amendment to 44 C.F.R. § 60.3(a)(2) or implementation of the RPA prior to completing the prerequisite APA rulemaking and NEPA environmental review.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), and 28 U.S.C. § 2202 (injunctive relief). The challenged agency actions of NMFS and FEMA are subject to this Court's review pursuant to the ESA, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 702.

7.      On November 23, 2016, pursuant to the ESA, Plaintiff Oregon Home Builders Association ("OHBA") and several other members of Oregonians for Floodplain Protection sent

separate notices of intent to sue to NMFS and to FEMA, each of which complies with the

requirements of the ESA.  The notice of intent to sue sent to NMFS is attached hereto as Exhibit

1.  The notice of intent to sue sent to FEMA is attached hereto as Exhibit 2.  More than 60 days

have passed since receipt of such notices.  Therefore, Plaintiffs have complied with the 60-day

notice requirement for claims under the ESA and this Court has jurisdiction to review Plaintiffs'

ESA claims.

   8. The APA allows this Court to hold unlawful and set aside agency action that is

arbitrary and capricious, an abuse of discretion, or not otherwise in accordance with law, 5

U.S.C. § 706(2)(A); that is in excess of the statutory jurisdiction, authority or limitation, 5 U.S.C.

§706(2)(C); and that is undertaken without observance of procedures required by law, 5 U.S.C.

§706(2)(D).  The APA provides a cause of action for parties adversely affected by final agency

action when "there is no other adequate remedy in a court."  5 U.S.C. § 704. Plaintiffs challenge

final agency actions as defined by the APA, 5 U.S.C. § 704.

   9. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)

because a substantial part of the events giving rise to the claims occurred in this District,

including final decisions by both NMFS and FEMA regarding the Biological Opinion's

conclusion and the terms of the RPA; Plaintiff Oregonians for Floodplain Protection is

incorporated in this District; Plaintiff National Association of Home Builder's principal place of

business is in this District; the U.S Department of Commerce and FEMA, as well as many of the

federal officials responsible for the challenged actions reside in this District; and implementation

of the RPA will affect the NFIP nationwide, not just in Oregon.

### III. PARTIES AND STANDING

   10. Plaintiff Oregonians for Floodplain Protection is a non-profit corporation formed

in the District of Columbia.  Oregonians for Floodplain Protection's purpose is to support and

advocate for sustainable floodplain development policies.  Oregonians for Floodplain Protection is an association of national and local industry trade associations, individual property owners in Oregon, and NFIP-participating jurisdictions in Oregon.  Members of Oregonians for Floodplain Protection have been and will continue to be directly and adversely affected by the Biological Opinion and FEMA's implementation of the RPA.

11.     Several members of Oregonians for Floodplain Protection are NFIP participating communities in Oregon, including, but are not limited to, Tillamook County, Coos County, and the City of Warrenton.  The NFIP participating community members are being coerced to limit development within their floodplains by the Biological Opinion and FEMA's current and ongoing implementation of the RPA.  Implementation of the RPA will directly and negatively affect development patterns within their jurisdictions, threaten to force revisions to the existing boundaries between urban and rural/resource lands that are fundamental to Oregon's land use system, reduce their tax bases, expose them to financial liability to property owners, and limit development of properties owned by the jurisdictions within the floodplain.  These member jurisdictions are concerned that if they do not comply with FEMA's direction to implement the RPA, particularly Element 2, FEMA will suspend or terminate them from the NFIP, forcing their residents to default on the terms and conditions of their federally backed mortgages that require flood insurance.  Each of the NFIP participating community members has significant portions of their jurisdictional land in the mapped Special Flood Hazard Area ("SFHA").

12.     Similarly, individual members of Oregonians for Floodplain Protection own properties and businesses located within the SFHA, and in some cases within the FEMA-designated floodway, within NFIP participating jurisdictions in Oregon.  Those member property owners and businesses are being constrained by their local jurisdictions' imminent implementation of development limitations in order to continue to participate in the NFIP.  The

development potential and value of their properties located in the floodplain have already been curtailed by NMFS's issuance of the Biological Opinion, and will be more significantly curtailed, and in some cases entirely eliminated, by FEMA's implementation of the development restrictions set forth in the RPA.  Several members have specific and imminent plans to develop their floodplain properties, which will be prohibited or at least substantially curtailed by their local government adopting the development restrictions demanded by FEMA as part of implementing the RPA, particularly the Interim Measures proposed in Element 2.

13.     Oregonians for Floodplain Protection and its members are concerned about and dedicated to protecting the environment and the land use system developed in Oregon over the last 40 years.  Implementation of the development restrictions set forth in the RPA will undermine that land use system, forcing urban development to expand into areas that have been recognized and preserved as a combination of rural and resource lands, including agricultural lands and forestry lands.  This will upset the careful system that the State of Oregon and its local jurisdictions have worked diligently to develop and maintain to balance beneficial use and preservation of Oregon's lands.

14.     Further, several members of Oregonians for Floodplain Protection have participated voluntarily in significant projects in the FEMA-designated floodplain aimed at restoring and preserving habitat for ESA-listed anadromous fish species in Oregon.  Those projects and the resulting benefits for ESA-listed species and habitat are not, however, acknowledged by NMFS in the Biological Opinion.

15.     Plaintiff National Association of Home Builders ("NAHB") is a national trade organization incorporated in the State of Nevada with its principal place of business in Washington, D.C.  NAHB has served as the voice of America's housing industry since it was founded in 1942.  NAHB is a federation of more than 700 state and local associations, including

those in Oregon, and represents more than 140,000 members, including homebuilders and remodelers, as well as industry members working in sales and marketing, housing finance, and manufacturing and supplying building materials. NAHB's members construct about 80% of the new homes built in the United States, both single-family and multifamily.

16.     NAHB's members own and work on real property, including property located in the SFHA, that will be subject to new development restrictions as a result of the implementation of the RPA. NAHB's members also derive revenue from construction on such properties. NAHB's members' ownership and property interests have been and will continue to be impaired by NMFS's jeopardy and adverse modification findings in the Biological Opinion, as well as its issuance of the RPA, and FEMA's unauthorized implementation of the RPA, including Element 2. NAHB's members' ability to use their property and their property values will be impacted because implementation of the RPA will limit development on property located in floodplains.

17.     Plaintiff OHBA is a member of Oregonians for Floodplain Protection and a member of NAHB. OHBA and its members suffer injuries as a result of the Biological Opinion and FEMA's implementation of the RPA of the types identified in paragraphs 10-16 above. The above-described interests of Plaintiffs and their members have been, are being, and, unless this Court grants the relief prayed for herein, will continue to be adversely affected by NMFS's disregard of its statutory duties under the ESA and FEMA's failure to meet its statutory duties under the APA and NEPA.

18.     FEMA's failure to comply with APA rulemaking procedures prior to implementing its de facto amendment 44 C.F.R. § 60.3(a)(2) has denied the Plaintiffs and their members their right to notice and the opportunity to participate before FEMA makes significant changes to its program that affect the availability of NFIP flood insurance in their jurisdictions. The changes implemented by FEMA without the required APA rulemaking process also subject

Plaintiffs and their members to additional costly obligations before they may receive permits to develop their properties.

19.     FEMA's failure to comply with NEPA before implementing and enforcing its de facto amendment of 44 C.F.R. § 60.3(a)(2) and before beginning to implement the RPA undermines and injures the Plaintiffs' and their members' recreational, aesthetic, scientific, cultural, spiritual, and other interests and activities by altering the floodplain management criteria without taking a hard look at environmental impacts of those changes or reasonable alternatives.  If FEMA were directed to comply with NEPA, it could adopt alternatives that would lessen, and thus redress, Plaintiffs' and their members' injuries.

20.     FEMA's failure to comply with NEPA also causes Plaintiffs' procedural and informational injuries.  Plaintiffs have and will continue to advocate for sustainable floodplain development policies and seek to engage relevant decision-makers about the Biological Opinion. If FEMA had complied with NEPA, the process would have generated additional information, and Plaintiffs would have had access to this information, improving their ability to participate in decision-making and to suggest possible alternatives.

21.     A court order finding that the Biological Opinion, including the RPA, is in violation of the ESA and is invalid as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law under the APA would redress Plaintiffs' injuries by ensuring that environmental objectives of the ESA are pursued in light of the actual impacts of the NFIP and with appropriate reference to FEMA's authority and economic consequences.

22.     A court order requiring FEMA to comply with its procedural and substantive obligations under the APA and NEPA before amending 44 C.F.R. § 60.3(a)(2) or before implementing the RPA would remedy Plaintiffs' procedural injuries.

23.     NMFS is an office of the NOAA within the U.S. Department of Commerce that is charged with administering the ESA with respect to anadromous and marine species, including salmonids and killer whales.  NMFS has the responsibility to engage in ESA Section 7 consultation with other agencies to evaluate the effects of a proposed agency action on listed species under its jurisdiction.  The authority delegated to NMFS to administer and implement the ESA is subject to, and must be in compliance with, the applicable requirements of the ESA and the APA.

24.     Defendant Wilbur Ross is sued in his official capacity as the Secretary of the U.S. Department of Commerce.  As the Secretary of the U.S. Department of Commerce, Mr. Ross is the highest ranking official within the U.S. Department of Commerce and has ultimate responsibility for the administration and implementation of the ESA.

25.     Defendant Samuel D. Rauch, III, is sued in his official capacity as Acting Assistant Administrator of NMFS.  As Acting Assistant Administrator of NMFS, Mr. Rauch is charged with administering the ESA, including consultation with federal agencies under Section 7(a)(2).

26.     The U.S. Department of Commerce is a department within the U.S. government with the ultimate responsibility for implementing and enforcing compliance with the relevant provisions of the ESA.

27.     Defendant FEMA is an agency of the U.S. Department of Homeland Security. FEMA is responsible for the implementation of the NFIP.  The authority delegated to FEMA to administer and implement the NFIP is subject to, and must be in compliance with, the applicable requirements of the APA and NEPA.

28.     Defendant Robert Fenton is sued in his official capacity as Acting Administrator of FEMA.  As Acting Administrator of FEMA, Robert Fenton is charged with administering the NFIP.

## IV.     LEGAL BACKGROUND

### A. *National Flood Insurance Program Overview*

29.     The NFIP is a federal program administered by FEMA.  The NFIP was established by the passage of the National Flood Insurance Act of 1968 ("NFIA"), 42 U.S.C. § 4001-4129.  The NFIA enables property owners in participating communities to purchase insurance protection against losses from flooding through the federal government, provided that their participating communities adopt certain floodplain management regulations that are designed to reduce future flood damages.  42 U.S.C. § 4001(d).  The intent was to reduce future flood damage through community floodplain management ordinances and provide protection for property owners against potential losses through an insurance mechanism.  42 U.S.C. § 4002(b).

30.     The scope and purpose of the NFIA is to protect people and property from flood hazards.  No provision under the NFIA authorizes FEMA to adopt measures for the benefit of threatened and endangered species that extend beyond the primary purposes of the NFIA, which is avoidance of flood damage and flood losses.

31.     FEMA develops, and from time-to-time is required to revise, floodplain management criteria intended to reduce the amount of development exposed to floods, assist in reducing damage caused by floods, and "otherwise improve the long-range land management and use of flood-prone areas."  42 U.S.C. § 4102(c)(2).  FEMA's floodplain management criteria are codified in federal regulations at 44 C.F.R. §§ 60.1-.26.  Among FEMA's floodplain management criteria is 44 C.F.R. § 60.3(a)(2), which provides in relevant part, that NFIP participating communities shall:

Review proposed development to assure that all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law, including section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334.

32.     Flood insurance from FEMA is not available in communities that have not adopted floodplain management criteria consistent with FEMA's regulations.  42 U.S.C. § 4022(a)(1); 44 C.F.R. § 60.1(a).  If FEMA modifies its floodplain management criteria, all NFIP participating communities must implement those changes to maintain eligibility to participate in the NFIP.  Nearly all counties and cities in Oregon with any mapped floodplain within their jurisdictions are enrolled in the NFIP.

33.     FEMA oversees communities' participation in and eligibility for the NFIP in an ongoing manner.  FEMA conducts community visits and contacts to ensure proper implementation of NFIP requirements.  A community's failure to implement and enforce NFIP minimum criteria can result in probation or suspension from the NFIP, which would make federal flood insurance unavailable in that community.  44 C.F.R. § 59.24.

34.     The Flood Disaster Protection Act of 1973 and the Flood Insurance Reform Act of 1994, as amended, require those federal agencies that are responsible for overseeing federally-regulated and insured lenders to mandate the purchase of flood insurance for properties located within an area having special flood hazards for the term of the loan.  42 U.S.C. § 4012a.

35.     FEMA also implements a Community Rating System ("CRS"), a separate, voluntary program to encourage local jurisdictions to adopt floodplain management regulations that exceed FEMA's minimum development standards.  42 U.S.C. § 4022(b).  Under the CRS, insured parties in jurisdictions that have adopted floodplain management regulations that are more restrictive than FEMA's minimum development standards set forth in 44 C.F.R. Parts 59 and 60 are rewarded with lower insurance rates.  42 U.S.C. § 4022(b)(2).

11

36.     FEMA develops and revises maps and other information that identify flood-prone areas as part of its implementation of the NFIP.  42 U.S.C. § 4101.  Certain maps, known as Flood Insurance Rate Maps ("FIRMs"), identify various categories of flood hazard areas, including SFHAs and regulatory floodways, in which the NFIP's minimum development standards apply.  *See* 44 C.F.R. pt. 65.

**B.  *The Endangered Species Act***

37.     Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved ... [and] to provide a program for the conservation of such endangered species and threatened species[.]"  16 U.S.C. § 1531(b).

38.     Section 7(a)(2) of the ESA mandates an interagency consultation process to evaluate potential impacts to listed species and designated critical habitat before a federal agency may authorize, fund, or take any discretionary action.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.03.  The consultation process begins when a federal "action agency" (here FEMA) requests that NMFS or the U.S. Fish and Wildlife Service ("FWS") (each, a "Service" and collectively, the "Services"), or both, review a proposed action that may affect a listed species or destroy or adversely modify critical habitat. *Id*.  The Services have promulgated regulations regarding their implementation of Section 7.  50 C.F.R. pt. 402. The Services also have published various guidance documents on the ESA Section 7 consultation process, including the U.S. Fish & Wildlife Service and National Marine Fisheries Service, Endangered Species Consultation Handbook (1998).

39.     The consultation process usually begins as informal consultation.  If the action agency, after discussions with the Service(s), determines that the proposed action is not likely to affect any listed species or destroy or adversely modify designated critical habitat, and if the

12

Service(s) concur(s), the informal consultation is complete and the proposed project moves ahead.  If it appears that the agency's action may affect a listed species or destroy or adversely modify critical habitat, that agency may then prepare a biological assessment to assist in its determination of the project's effect on a species or critical habitat.

40.     Based on its review of the biological assessment and other data and information, if the action agency determines that the proposed action is not likely to affect any listed species or destroy or adversely modify critical habitat, and if the Service(s) concur(s), initiation of formal consultation is not required.  If it appears that the agency's action may affect a listed species or destroy or adversely modify critical habitat, the Service will prepare a biological opinion regarding whether the proposed activity will jeopardize the continued existence of a listed species or destroy or adversely modify critical habitat.   To "*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  The biological opinion must, among other things, be based upon "the best scientific and commercial data available" and must "give appropriate consideration to any beneficial actions taken by the federal agency or applicant, including any actions taken prior to the initiation of consultation." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

41.     To fulfill their ESA Section 7 duties for an action that an action agency proposes to implement, fund or authorize, the Services must evaluate "the effects of the action and cumulative effects on the listed species or critical habitat."  50 C.F.R. § 402.14(g)(3).  "Effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action that will be added to the environmental baseline.  50 C.F.R. § 402.02.  "Indirect effects are those

that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02.  Cumulative effects are "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

42.     In making a determination on whether an action will result in jeopardy, the Service begins by looking at the current status of the species, or "baseline."  The Services' joint consultation regulations require that the "environmental baseline" for analysis include "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  *See* 50 C.F.R. § 402.02.

43.     The biological opinion must include a summary of the information upon which the opinion is based, a "detailed discussion of the effects of the action on listed species or critical habitat," and an opinion as to "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat .…" 50 C.F.R. § 402.14(h)(2-3).

44.     If a proposed agency action is likely to jeopardize a listed species or adversely modify designated critical habitat, the Services must propose an RPA that will avoid those outcomes. 16 U.S.C. § 1536(b)(3)(A).  An RPA is one way—but not the only way—that an action agency may avoid jeopardy or adverse modification or destruction of critical habitat.

45.     An RPA must: (1) be capable of being implemented in a manner consistent with the intended purpose of the action; (2) be consistent with the scope of the action agency's legal authority and jurisdiction; (3) be economically and technologically feasible; and (4) avoid the likelihood of jeopardy to a species or the adverse modification or destruction of critical habitat.

14

50 C.F.R. § 402.02.  Further, as with the rest of the biological opinion, the RPA must be based upon "the best scientific and commercial data available" and must "give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

### C. *The National Environmental Policy Act*

46.     NEPA was enacted in 1970.  NEPA directs all federal agencies to assess the environmental impacts of proposed federal actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(C)(ii).  NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to insure that the public is informed and involved in decisions that affect the quality of the human environment. 40 C.F.R. § 1500.2.

47.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies.  42 U.S.C. § 4342; 40 C.F.R. §§ 1500.1-1508.08.  In addition, each federal agency is required to develop NEPA procedures that supplement the CEQ regulations.  40 C.F.R. § 1507.3.

48.     NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

49.     An EIS is a "detailed statement" that describes (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources

which would be involved in the proposed action should it be implemented."  42 U.S.C. §

4332(C).

50.     When it is not clear whether an action requires the preparation of an EIS, the

regulations direct agencies to prepare a document known as an environmental assessment ("EA")

to determine whether an EIS is required.  40 C.F.R. § 1501.4.  An EA is a "concise public

document" that must "briefly provide sufficient evidence and analysis for determining whether to

prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. §

1508.9(a).

51.     If, based on an EA, an agency determines that an action may have a significant

environmental impact, the agency must prepare an EIS. 40 C.F.R. § 1501.4(c). If the agency

determines that the impacts will not be significant, the agency must prepare a Finding of No

Significant Impact.  40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.13.

52.     Whether the agency prepares an EA or an EIS, or both, NEPA requires federal

agencies to "study, develop, and describe appropriate alternatives to recommended courses of

action in any proposal which involves unresolved conflicts concerning alternative uses of

available resources."  42 U.S.C. § 4332(2)(e). Alternatives must be given full and meaningful

consideration.  40 C.F.R. §§ 1502.14, 1508.9(b).

**D.     *The Administrative Procedure Act***

53.     Congress enacted the APA in 1946, prescribing the process by which federal

agencies develop and issue regulations and other agency actions such as policy statements,

licenses and permits.

54.     Before adopting a rule, the APA requires federal agencies to publish notice of the

proposed rule in the Federal Register, and after such notice, give interested persons an

opportunity to participate in the rulemaking.  5 U.S.C. § 553.

55.     The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4).

56.     An agency must follow the procedures of the APA before implementing a substantive amendment to an existing regulation.  An agency may not avoid the procedures of the APA by making a substantive amendment and calling that amendment mere "guidance" that interprets the existing regulation.

57.     The APA also authorizes courts to review final agency actions and grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.  The APA mandates that a court hold unlawful and set aside such actions, findings, and conclusions when they are: (a) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A); (b) in excess of statutory jurisdiction, authority or limitation, 5 U.S.C. § 706(2)(C); or (c) without observance of procedures required by law, 5 U.S.C. § 706(2)(D).

58.     Biological opinions issued pursuant to Section 7 of the ESA, including the Biological Opinion regarding FEMA's implementation of the Oregon NFIP, are subject to judicial review under the APA.

59.     Failures to abide by the requirements of NEPA and the APA are subject to judicial review under the APA.  5 U.S.C. §§ 702, 706.

## V.     FACTS GIVING RISE TO PLAINTIFFS' CAUSE OF ACTION

### A. *The Prior Litigation and the Oregon NFIP Consultation*

60.     On June 25, 2009, Audubon Society of Portland, Northwest Environmental Defense Center, the National Wildlife Federation, and the Association of Northwest Steelheaders

filed suit against FEMA for failing to consult on the effects of the NFIP on threatened and
endangered species in Oregon.  In July 2010, FEMA reached a settlement with the plaintiffs
under which FEMA agreed to initiate ESA consultation regarding the effects of the
implementation of the NFIP in Oregon on certain ESA-listed species.

61.     On July 18, 2011, FEMA provided a letter to NMFS requesting formal
consultation under the ESA regarding the implementation of the NFIP in the State of Oregon.
FEMA initiated formal consultation with NMFS on August 15, 2012.  As part of its consultation
request, FEMA provided to NMFS its *Program Level Biological Assessment for the National
Floodplain Insurance Program Oregon State* ("Biological Assessment") in February 2013,
which relied upon FEMA's de facto amendment to 44 C.F.R. § 60.3(a)(2).

62.     Almost four years later, on April 14, 2016, NMFS issued a Biological Opinion on
the impacts of the NFIP in Oregon on 17 ESA-listed anadromous fish species and Southern
Resident killer whales.  In the Biological Opinion, NMFS determined that the implementation of
the NFIP in Oregon as proposed by FEMA would jeopardize the survival and recovery of 16 of
the 17 ESA-listed anadromous fish species considered in the Biological Opinion and Southern
Resident killer whales, and would destroy or adversely modify the designated or proposed
critical habitat for the 16 anadromous fish species.

63.     NMFS issued a six element RPA to FEMA's proposed implementation of the
NFIP for the 16 anadromous listed species and Southern Resident killer whales for which it
found jeopardy.  Element 1 directs FEMA to give notice of NMFS's conclusions in the
Biological Opinion and the terms of the RPA to the Oregon NFIP participating communities.
Element 2 directs FEMA to implement "Interim Measures" pending full RPA implementation.
Element 3 directs FEMA to revise its mapping protocols nationwide and to map erosion prone
areas under the NFIP.  Element 4 directs FEMA to modify the NFIP floodplain management

criteria nationwide, including to adopt an "ESA performance standard."  Element 5 directs FEMA to collect data from NFIP participating communities and to document and report impacts of floodplain development.  Element 6 directs FEMA to enforce the amended floodplain management criteria.

64.     NMFS set a series of deadlines in the Biological Opinion for each element of the RPA.  For example, the Biological Opinion sets March 15, 2018, as the deadline for implementation of the Interim Measures set forth in Element 2, and January 1, 2021, as the deadline for implementation of any components of the RPA that FEMA determines require regulatory revisions. Biological Opinion at 277.

65.     The Biological Opinion contains numerous deficiencies that render the jeopardy and adverse modification or destruction determinations, as well as the RPA, in violation of the ESA and arbitrary and capricious or otherwise not in accordance with the law.

66.     The Biological Opinion misconstrues the scope of the agency action.  The NFIP is a flood insurance program.  It does not authorize floodplain development.  FEMA has repeatedly explained that private floodplain development, not the NFIP, causes changes to the pre-existing condition of the floodplain (if any).

67.     The Biological Opinion fails to consider the correct environmental baseline.  In particular, in contravention of its own regulations, NMFS failed to incorporate required factors into the environmental baseline, including "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

68.     The Biological Opinion fails to demonstrate or document how the NFIP causes floodplain development, or to identify which floodplain development NMFS believes is caused by the NFIP.  Instead, the Biological Opinion's effects analysis wrongly attributes *all* development within the floodplain, and the impacts thereof, to the NFIP, including wholly private development that is not insured through the NFIP and development that predated the NFIP.

69.     The Biological Opinion fails to take into consideration the existing conditions in Oregon's floodplains, including existing developed and degraded conditions; fails to differentiate between the effects of development of unaltered areas as compared to the effects of redevelopment of previously developed areas; and fails identify areas of development that occurred prior to the implementation of the NFIP and prior to the initiation of the subject ESA consultation.

70.     The Biological Opinion fails to differentiate between alleged direct and indirect effects of the NFIP on any listed species or designated critical habitat.  To the extent private floodplain development is an indirect effect of the NFIP, the Biological Opinion fails to limit its effects analysis to indirect effects that are reasonably certain to occur.

71.     The Biological Opinion both attributes the effects of private floodplain development to the NFIP and also considers those effects as "cumulative effects."  As a result, NMFS "double counts" the effects of floodplain development on listed species or designated critical habitat in conducting its analysis.  Further, in considering private floodplain development as a "cumulative effect," the Biological Opinion fails to limits its analysis of cumulative effects to those that are reasonably certain to occur.

72.     The Biological Opinion fails to include any reasonable basis for the conclusion that FEMA's implementation of the NFIP in Oregon is likely to cause particular impacts to the

listed species or designated critical habitat.  Further, the Biological Opinion fails to consider the probability of any given impact.  The Biological Opinion assumes that any and all *possible* impacts of floodplain development will occur with every development project and will be 100% attributable to the NFIP, regardless of the actual or probable impacts of any given development and the unique circumstances of such development.

73.     In the Biological Opinion, NMFS failed to provide a reasonable evidentiary basis for the Biological Opinion's jeopardy conclusion.  In particular, the Biological Opinion fails to identify the magnitude of any loss or degradation of aquatic systems, the species populations' ability to tolerate any such impacts, or how any impacts will considerably or materially reduce the likelihood of survival or recovery.

74.     The Biological Opinion fails to provide a reasonable basis for the conclusion that FEMA's implementation of the NFIP destroys or adversely modifies critical habitat because the evidence does not demonstrate that any adverse effects will "considerably reduce" the value of critical habitat.

75.     NMFS adopted an RPA that is in violation of the ESA and its implementing regulations.  The RPA it is not within the scope of FEMA's statutory authority under the NFIA. FEMA has repeatedly explained to NMFS that implementation of the RPA is not within its authority.  *See* Letter from Roy E. Wright, FEMA Deputy Associate Administrator for Mitigation, to William Stelle, NMFS Regional Administrator (May 29, 2014); Letter from Mark Carey, FEMA Mitigation Division Director, to Kim Kratz, Ph.D., NMFS Assistant Regional Administrator (Jan. 14, 2015); Letter from Mark Carey, FEMA Mitigation Division Director, to Kim Kratz, Ph.D. (June 3, 2015); Letter from Michael M. Grimm, FEMA Assistant Administrator for Mitigation, to Kim Kratz, Ph.D, NMFS Assistant Regional Administrator.

(May 4, 2016).  NMFS disregarded FEMA's contrary interpretation of the limits on its authority and misapplied tenants of statutory construction in construing the NFIA.

76.     RPA Elements 2, 4 and 5 are not within FEMA's legal authority because their implementation depends on actions by third parties.  Elements 2 and 4 depend on NFIP participating communities taking separate actions to amend their flood hazard development regulations to implement the changes set forth in those RPA Elements. Element 5 depends on NFIP participating communities providing information regarding issued floodplain permits that is not otherwise required by the NFIP.

77.     The RPA is not economically and technologically feasible.  The Biological Opinion did not analyze the actual costs to FEMA of implementing the RPA or FEMA's ability to bear those costs.

78.     The Biological Opinion also fails to consider the ability of NFIP participating communities to bear the costs of implementing the RPA.  RPA Elements 2 and 4 will require NFIP participating communities to complete separate public administrative processes to amend their existing flood hazard development regulations.  These processes are typically expensive and time consuming, requiring public notice, staff analysis, and one or more public hearings. RPA Element 5 will require NFIP participating communities to collect and report data regarding permits for development in the floodplain.

79.     The Biological Opinion fails to adequately explain how the RPA will avoid jeopardy to the species or destruction or adverse modification of critical habitat.

**B.  *FEMA's De Facto Amendment to 44 C.F.R. § 60.3(a)(2)***

80.     The NFIP's minimum floodplain development criteria were originally promulgated in 1976.  41 Fed. Reg. 46,975 (Oct. 26, 1976).  44 C.F.R. § 60.3(a)(2) states that NFIP participating communities must "review proposed development to assure that all necessary

permits have been received from those governmental agencies from which approval is required by Federal or State law, including section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334."  44 C.F.R. § 60.3(a)(2).

81.     FEMA provided its Biological Assessment of the Oregon NFIP to NMFS as part of its request to initiate formal consultation.  In the Biological Assessment, FEMA set forth its new statement of the requirements of 44 C.F.R. § 60.3(a)(2).  Specifically, FEMA states: "NFIP communities must ensure that permit applicants have demonstrated compliance with the ESA before issuing a floodplain development permit per the NFIP regulations (44 C.F.R. 60.3(a)(2))."  Biological Assessment at 2-37.  FEMA further explains this new requirement as follows: "if the potential of a 'take' exists for a proposed development permit within the SFHA, the community has a requirement under Part 60.3.a.2 to ensure the ESA 'permit for take' has been obtained from NMFS."  Biological Assessment at 2-40.  FEMA identified a "permit for take" as either an ESA Section 10 permit or "any Incidental Take Statement issued to federal agencies under Section 7 of the ESA . . . ."  Biological Assessment at 2-40-2-41.

82.     Prior to the Biological Assessment, FEMA had not interpreted 44 C.F.R. § 60.3(a)(2) as requiring an NFIP participating community to require a floodplain development permit applicant to obtain an ESA "permit for take" (Section 10), or otherwise to demonstrate compliance with the ESA prior to issuing a floodplain development permit.

83.     NMFS referred to FEMA's effort to revise its interpretation of 44 C.F.R. § 60.3(a)(2) as requiring NFIP participating communities to require floodplain permit applicants to obtain an "ESA permit" or otherwise comply with the ESA as "a significant flaw," explaining that 44 C.F.R. § 60.3(a)(2) refers to "necessary permits . . . required by Federal or State law." Biological Opinion at 40.  NMFS explained in the Biological Opinion that ESA Section 10 permits are elective, not required, and consequently do not fall within the purview of 44 C.F.R. §

60.3(a)(2).  *Id.*  Further, Incidental Take Statements ("ITSs") are available only as a part of an ESA Section 7 consultation.  Private floodplain development projects that do not require or depend on either any federal authorization or federal funding, however, do not require a Section 7 consultation.  As a result, an ITS is not a "required permit" for private floodplain development projects that do not require or depend on either any federal authorization or federal funding.

### C. *FEMA's Implementation of the RPA*

84.   FEMA has begun implementing the RPA.

85.   Consistent with RPA Element 1, on June 13, 2016, FEMA Region X sent a notice letter to NFIP participating jurisdictions in Oregon notifying those communities of the Biological Opinion, alleging their responsibilities under the Biological Opinion and RPA, and explaining FEMA's intent to implement the RPA.  Biological Opinion at 277-278.  The notice letter characterizes the RPA's implementation, beginning with the Interim Measures in Element 2, as a definite and imminent matter that will be implemented according to the terms of the RPA.  *See* Letter from Mark Carey, FEMA Region X Mitigation Division Director, to NFIP participating communities in the State of Oregon (June 13, 2016).

86.   Element 2 of the RPA directs FEMA to require NFIP participating communities to adopt "Interim Measures" intended to protect floodplain habitat and listed species.  Biological Opinion at 278-280.  First, Element 2(A) directs FEMA to require that all development in the SFHA be mitigated to achieve no net loss of natural floodplain function, and sets forth several mitigation ratios for compensatory storage, vegetation removal, and placement of impervious surface applicable to development within the floodplain irrespective of the actual effects of the development.  Second, Element 2(B) directs FEMA to require local jurisdictions to adopt a "riparian buffer zone" ("RBZ") and to prohibit all development in the RBZ other than open space, habitat restoration, activities that result in a beneficial gain for the species or habitat, and

24

activities that will have no adverse effects on listed species or habitat.  Further, Element 2 directs FEMA to revise its map revision procedures to decline all floodplain map amendments for which the applicants fail to demonstrate that all impacts of development to natural floodplain functions have been avoided or mitigated, or where the proposed development may adversely affect natural floodplain functions.

87.     In its notice letter, as well as during several presentations to NFIP participating communities in Oregon in 2016, FEMA has represented that NFIP participating communities are responsible for complying with the RPA, beginning with Element 2.  In making this assertion, FEMA is relying on its de facto amendment to 44 C.F.R. 60.3(a)(2), and determining that NFIP participating communities may demonstrate compliance with 44 C.F.R. § 60.3(a)(2) by applying the development regulations set forth in the RPA, beginning with Element 2, to floodplain development permits.

88.     FEMA is implementing RPA Element 2 through a coordinated process with the Oregon Department of Land Conservation and Development ("DLCD"), the state agency charged with regulating land use in Oregon.  In June and July of 2016, FEMA and the DLCD held workshops with local governments to identify the methods by which communities can implement the RPA.  FEMA and the DLCD are developing a model ordinance that incorporates the requirements of the RPA.

89.     To date, FEMA has not initiated or completed review under NEPA despite taking actions to implement the RPA.  Further, to date, FEMA has not initiated or completed APA rulemaking despite the fact that the NFIP's existing regulations do not authorize FEMA to require NFIP participating communities to comply with the RPA to maintain their participation in the NFIP.

90.     Development in floodplains and in surrounding areas will be restricted as a result of the implementation of the RPA.  Limitations on development within floodplains may redirect development to other areas, namely on lands outside of the mapped floodplain, which will have impacts on the natural and human environment.

91.     FEMA has repeatedly stated that it is not a permitting or land use authority. FEMA interprets its own authority under the NFIA as limited, and has explained that the NFIA does not give FEMA the authority to regulate privately funded development on private land, nor does it give FEMA the authority to adopt measures to protect listed species or their habitat. Nevertheless, by implementing the RPA, particularly RPA Element 2, which prohibits or severely restricts development in the floodplain, FEMA is dictating to NFIP participating communities – and through the communities to property owners – how their land may be used and developed.

## VI.     CAUSES OF ACTION

### COUNT 1:  NMFS's ESA and APA Violations – Incorrect Scope of FEMA's Action

92.     Plaintiffs incorporate by reference all preceding paragraphs.

93.     In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS mischaracterizes the scope of FEMA's action under the NFIP subject to ESA Section 7 consultation.

94.     This error, as further described in paragraph 66 above, is not in accordance with and violates 16 U.S.C. § 1536(a)(2) and 50 CFR § 402.14(g)-(h).  This error constitutes a violation of the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

26

***COUNT 2: NMFS's ESA and APA Violations – Incorrect Baseline***

95.     Plaintiffs incorporate by reference all preceding paragraphs.

96.     In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS did not consider all relevant factors in the environmental baseline.  50 C.F.R. § 402.02.

97.     This error, as further described in paragraph 67 above, is not in accordance with and violates 16 U.S.C. § 1536(a)(2) and 50 CFR 402.14(g)-(h).  This error constitutes a violation of the APA because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

***COUNT 3:  NMFS's ESA and APA Violations – Flawed Effects Analysis***

98.     Plaintiffs incorporate by reference all preceding paragraphs.

99.     In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS relied on an incorrect environmental baseline in its effects analysis.

100.     In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to isolate the impacts of the NFIP from pre-existing impacts or improbable future impacts.

101.     In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to differentiate

27

between the direct and indirect effects of the NFIP, and consequently included in its analysis indirect effects that are not reasonably certain to occur.

102.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS included the effects of private floodplain development both as an effect of the NFIP and as "cumulative effects," thereby "double counting" the effects of private floodplain development in its effects analysis. Further, in considering private floodplain development as a "cumulative effect," NMFS failed to limit its analysis of cumulative effects to those that are reasonably certain to occur.

103.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to provide any reasonable basis for the Biological Opinion's conclusion that FEMA's implementation of the NFIP in Oregon is likely to cause particular impacts to the listed species or designated critical habitat.

104.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to include a reasonable evidentiary basis for the jeopardy conclusion.  In particular, it failed to identify the magnitude of any loss or degradation of aquatic systems, the species populations' ability to tolerate any such impacts, or how any impacts will considerably or materially reduce the likelihood of survival or recovery.

105.    In determining that FEMA's implementation of the NFIP in Oregon results in jeopardy to 16 anadromous fish species and Southern Resident killer whales and destroys or

adversely modifies critical habitat of 16 anadromous fish species, NMFS failed to provide a reasonable basis for the Biological Opinion's conclusion that FEMA's implementation of the NFIP destroys or adversely modifies critical habitat because the evidence does not demonstrate that any adverse effects will "considerably reduce" the value of critical habitat.

106.    These errors, as further described in paragraphs 67-74 above, violate 16 U.S.C. § 1536(a)(2) and 50 CFR 402.14(g)-(h).  These errors constitute violations of the APA because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

### COUNT 4:  NMFS's ESA and APA Violations – The RPA is Arbitrary and Capricious and Otherwise Not in Accordance with the Law

107.    Plaintiffs incorporate by reference all preceding paragraphs.

108.    NMFS's regulations require that RPAs must be implemented in a manner consistent with the intended purpose of the action, be within the scope of the action agency's legal authority and jurisdiction, be economically and technologically feasible, and must avoid the jeopardy to the ESA-listed species or destruction or adverse modification of critical habitat. 50 C.F.R. § 402.02.  NMFS' RPA as set forth in the Biological Opinion is arbitrary and capricious and not in accordance with 50 C.F.R. § 402.02.

109.    In developing and describing the RPA, NMFS sought to impose on FEMA requirements that exceed FEMA's legal authority and jurisdiction.

110.    In developing and describing the RPA, NMFS failed to analyze whether the RPA was in fact economically or technologically feasible based on the actual costs to FEMA of implementing the RPA or FEMA's ability to bear those costs.

111.    In developing and describing the RPA, NMFS failed to conduct any analysis regarding whether the RPA was in fact economically or technologically feasible for the NFIP participating communities burdened with implementing it.

112.    In developing and describing the RPA, NMFS failed to use the best scientific and commercial data available and without giving appropriate consideration to beneficial actions taken by FEMA, NFIP participating communities or others.

113.    In developing and describing the RPA, NMFS failed to provide reasonable support demonstrating that the RPA would avoid jeopardy of the species or destruction or adverse modification of critical habitat.

114.    These errors, as further described in paragraphs 75-79 above, violate 16 U.S.C. § 1536(a)(2) and 50 C.F.R. §§ 402.02 and 402.14(g)(8).  These errors constitute violations of the APA because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

### COUNT 5:  FEMA'S APA Violation - The RPA and De Facto Amendment to 44 C.F.R. § 60.3(a)(2) are Arbitrary and Capricious, in Excess of Statutory Authority, and Otherwise Not in Accordance with the Law

115.    Plaintiffs incorporate by reference all preceding paragraphs.

116.    The APA defines rulemaking as the "agency process for formulating, amending, or repealing a rule."  5 U.S.C. § 551.  The APA requires agencies to provide notice and comment opportunities before promulgating rules.  5 U.S.C. § 553(b), (c).

117.    As explained in the Biological Assessment, and in an effort to provide itself with authority to implement the RPA, FEMA has adopted a de facto amendment to 44 C.F.R. § 60.3(a)(2).  Through this adoption and application of a de facto amendment of 44 C.F.R. § 60.3(a)(2), FEMA imposed new legal obligations on NFIP participating communities and floodplain development applicants.

118.    The de facto amendment of 44 C.F.R. § 60.3(a)(2) is a legislative rule because it amends an existing legislative rule, alters the NFIP's requirements, and imposes new legal obligations with substantial future effects on local jurisdictions and floodplain development

applicants.  As a legislative rule, the de facto amendment of 44 C.F.R. § 60.3(a)(2) was subject

to APA section 553.  Contrary to the APA, FEMA has not provided notice or opportunity to

comment on the proposed rule.

119.    FEMA's imposition of ESA-based requirements on NFIP participating

communities and floodplain development applicants exceeds its authority.

120.    FEMA's failure to provide for notice and comment prior to adopting the de facto

amendment to 44 C.F.R. § 60.3(a)(2) deprived Plaintiffs of their right to comment on and inform

the outcome of the rulemaking.

121.    FEMA's failure to follow notice and comment rulemaking procedures as required

by 5 U.S.C. § 553 constitutes unlawful agency action without observance of required procedures

under 5 U.S.C. § 706(2)(A), (D) and under its own rulemaking regulations at 44 CFR pt. 1.

### COUNT 6: FEMA'S NEPA Violation – Failure to Analyze Environmental Impacts and Consider All Reasonable Alternatives

122.    Plaintiffs incorporate by reference all preceding paragraphs.

123.    FEMA is a federal agency subject to NEPA, 42 U.S.C. §§ 4321-4370m-12.

124.    FEMA's implementation of the RPA constitutes a major federal action

significantly affecting the quality of the human environment.

125.    FEMA's implementation of its de facto amendment to 44 C.F.R. § 60.3(a)(2)

constitutes a major federal action significantly affecting the quality of the human environment.

126.    FEMA is required to complete review under NEPA prior to implementing any

portion of the RPA or its de facto amendment to 44 C.F.R. § 60.3(a)(2).  In violation of NEPA,

FEMA did not prepare an environmental impact statement, finding of no significant impact,

environmental assessment or exemption prior to either action.  This constitutes unlawful agency

action without observing required procedures under 5 U.S.C. § 706(2)(A), (D).

31

127.    In addition, in failing to complete the required environmental review, FEMA failed to consider a reasonable range of alternatives other than the RPA or the de facto amendment to 44 C.F.R. § 60.3(a)(2).  That error was arbitrary, capricious, and contrary to NEPA and its implementing regulations, 42 U.S.C. § 4332(2); 40 C.F.R. §§ 1502.14, 1508.9(b).

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment providing the following relief:

1.    Order and declare that NMFS is in violation of the ESA and the APA because the Biological Opinion issued by NMFS relating to FEMA's implementation of the NFIP in Oregon violates the ESA and is arbitrary, capricious, and not in accordance with law, and that the RPAs are not binding or otherwise effective;

2.    Order and declare that FEMA is in violation of the APA because FEMA issued a legislative rule without abiding by the notice and comment requirements of the APA Section 553;

3.    Order and declare that FEMA is in violation of NEPA because FEMA is implementing the RPA and the de facto amendment to 44 C.F.R. § 60.3(a)(2), each of which constitute a major federal action that will significantly impact the environment, without complying with NEPA;

4.    Order NMFS to withdraw the Biological Opinion and the RPA;

5.    Enjoin implementation of the Biological Opinion, the RPA, and FEMA's de facto amendment to 44 C.F.R. § 60.3(a)(2) until Defendants have demonstrated compliance with NEPA, the ESA, and the APA;

6.    Award Plaintiffs their costs of litigation, including reasonable costs, expenses, disbursements, and reasonable attorneys' fees; and

7.      Grant Plaintiffs such further and other relief as this court deems just and proper.

Dated this 15th day of June, 2017.

   /s/ Michael D. Farber
Michael D. Farber (D.C. Bar # 449215)
Molly Lawrence (Application for D.C. Pending)
Jenna Mandell-Rice (D.C. Bar #1021549)
Van Ness Feldman LLP
1050 Thomas Jefferson St. N.W.
Washington, D.C. 20007
(202) 298-1800
mfarber@vnf.com
mol@vnf.com
jrm@vnf.com
*Attorneys for Plaintiffs*