**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

OREGONIANS FOR FLOODPLAIN
PROTECTION, *et al.*,

        Plaintiffs,

        v.                 Civil Case No. 1:17-cv-01179

THE U.S. DEPARTMENT OF COMMERCE,
*et al.*,

        Defendants.

_____

## MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(1), Federal Defendants (United States Department of

Commerce, Wilbur L. Ross, in his official capacity, National Marine Fisheries Service,

Christopher Oliver, in his official capacity, Federal Emergency Management Agency, and

William B. "Brock" Long,  in his official capacity) move to dismiss the Plaintiffs' Complaint in

this action for lack of jurisdiction.  As is more fully detailed in the accompanying memorandum,

Plaintiffs have not alleged facts sufficient to establish that the agency actions they challenge

caused the injuries they complain of; thus, they lack standing, and the Court lacks jurisdiction

over their Complaint.

In the event that the Court does not dismiss the entire Complaint for lack of standing, and

for the reasons detailed more fully in the accompanying memorandum, the United States moves

to dismiss all Plaintiffs' Fifth and Sixth claims for relief on finality and ripeness grounds

pursuant to Fed. R. Civ. P. 12(b)(1).

Dated:  September 8, 2017

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief


*s/ Mark Arthur Brown*
MARK ARTHUR BROWN
D.C. Bar No. 470050
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0204
Facsimile: (202) 305-0275
mark.brown@usdoj.gov

SARAH IZFAR
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0490
Sarah.izfar@usdoj.gov

Counsel for Defendants

Of Counsel:

SABRINA McBRIDE
RAZEYEH JAFARZADEH
Office of General Counsel
Federal Emergency Management Agency
500 C Street, S.W.
Washington, D.C.  20472
(202) 646-3235

LAURIE K. BEALE
Attorney-Advisor, Northwest Section
NOAA Office of General Counsel
U.S. Department of Commerce
7600 Sand Point Way NE
Seattle, WA 98115
(206) 526-6327

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2017, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

_____/s/ *Mark Arthur Brown*_____
MARK ARTHUR BROWN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

OREGONIANS FOR FLOODPLAIN
PROTECTION, *et al.*,

          Plaintiffs,

          v.                     Civil Case No. 1:17-cv-01179

THE U.S. DEPARTMENT OF COMMERCE,
*et al.,*

          Defendants.
_____

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**<u>INTRODUCTION</u>**

     Plaintiffs allege that they may be injured in the future when the Federal Emergency Management Agency (FEMA) begins to implement measures called for by the National Marine Fisheries Service (NMFS) pursuant to the Endangered Species Act (ESA) in a recent biological opinion concerning the implementation of the National Flood Insurance Program (NFIP) in Oregon.  However, because FEMA has not yet determined how it will implement these measures, Plaintiffs cannot allege any concrete or imminent injury with respect to either NMFS's issuance of the biological opinion or FEMA's plans to implement these measures.  Plaintiffs' claims against both NMFS and FEMA must be dismissed for lack standing.  In the alternative, principles of finality and ripeness preclude review of Plaintiffs' Fifth and Sixth Claims for relief against FEMA.  In short, Plaintiffs' claims must be dismissed because FEMA has not yet taken any final, reviewable agency action with respect to implementation of NMFS's biological opinion.  To the contrary, FEMA is currently in the process of determining how to implement the

reasonable and prudent alternatives (RPAs) in NMFS's biological opinion. *See* Declaration of

Michael Grimm (Grimm Decl.) (filed herewith as Exhibit 1).

**STATUTORY AND REGULATORY BACKGROUND**

**I.      The National Flood Insurance Act and the National Flood Insurance Program**

The NFIP is a voluntary program through which property owners in participating

communities can purchase Federal flood insurance as a protection against flood losses.  In

exchange, communities must enact floodplain management regulations to reduce flood risk and

flood-related damages.  Providing NFIP flood insurance indemnifies property owners from flood

losses and reduces the costs of disaster assistance.  NFIP floodplain management requirements

are designed to reduce future flood damages and reduce disaster assistance costs.  As explained

below, FEMA has no direct involvement in the administration of local floodplain management

ordinances.  The NFIP operates as a Federal-State-local partnership that depends on State

statutes and regulations authorizing local governments to regulate floodplain development under

the State's police powers to protect the health, safety, and general welfare of its citizens.

Congress established the NFIP with the passage of the National Flood Insurance Act of

1968.  42 U.S.C. § 4001 *et seq*.  The NFIP was further modified in 1973, and then again in 1994

with the passage of the Flood Disaster Protection Act and the National Flood Insurance Reform

Act.  42 U.S.C. § 4001 *et seq*.; Pub. L. No. 93-234, 87 Stat. 9705 (1973); Pub. L. No. 103-325,

Title 5, 108 Stat. 2255 (1994).  Most recently, the NFIP was modified by the Biggert-Waters

Flood Insurance Reform Act of 2012, Pub. L. No.  112-141, 126 Stat. 916 (2012) and the

Homeowner's Flood Insurance Affordability Act of 2014, Pub. L. No. 113-89, 128 Stat. 1030

(2014).  The NFIP is first and foremost a program for the provision of flood insurance.  42

U.S.C. § 4001(d).  With respect to the sale of flood insurance, Congress expressly authorized the

2

Director of FEMA (Director) to carry out a "program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States." 42 U.S.C. § 4011(a). In defining FEMA's authority to sell or underwrite flood insurance, Congress limited the agency's role:

> The Director shall make flood insurance available in only those States or areas (or subdivisions thereof) which he has determined have –
>
> (1) evidenced a positive interest in securing flood insurance coverage under the flood insurance program, and
>
> (2) given satisfactory assurance that by December 31, 1971, adequate land use and control measures will have been adopted for the State or area (or subdivision) which are consistent with the comprehensive criteria for land management and use developed under section 4102 of this title . . .

42 U.S.C. § 4012(c); *see also* 44 C.F.R. Part 62. Thus, if a community implements adequate land use measures, FEMA must perform the ministerial act of selling flood insurance. This sale occurs through one of two mechanisms. Qualified applicants can obtain flood insurance either through private companies, commonly referred to as the "write your own" (WYO) program, *see* 44 C.F.R. § 62.23, or applicants may obtain insurance directly through FEMA. 44 C.F.R. § 62.1.

Congress also directed FEMA to set certain nationally applicable minimum floodplain management criteria related to reducing flood hazard risk in floodplain areas for all NFIP participating communities. 42 U.S.C. § 4102. In order to participate in the NFIP, a community must adopt and enforce floodplain management regulations that meet the NFIP floodplain management criteria (44 C.F.R. § 59.2(b), 59.22(a)(3), 60.1(d), 60.3(a) through (f)). The intent of these standards is to reduce flood risk and loss of life and property. *See* 42 U.S.C. § 4001(c). Additionally, communities are allowed, and encouraged, to adopt floodplain management

3

regulations that are more restrictive than the minimum criteria.  *See id.* § 4001(e).

Communities incorporate the floodplain management criteria into their zoning codes, subdivision ordinances, and building codes, or they adopt special purpose floodplain management ordinances.  44 C.F.R. § 59.2(b).  The community ordinances must also include effective enforcement provisions.  *Id.*  A community that fails to adequately enforce its floodplain management ordinance may be put on probation or suspended from the NFIP.  44 C.F.R. § 59.24(b)-(c).

Congress also provided encouragement for communities to adopt measures that reduced their flood risk through the Community Rating System (CRS).  42 U.S.C. § 4022(b).  The CRS provides discounts on flood insurance premiums in communities that independently choose to establish additional floodplain management regulations that exceed FEMA's minimum criteria.  *Id.* § 4022(b)(1)(A).  Congress again was clear: "The Administrator shall carry out a community rating system program, under which communities participate voluntarily."  42 U.S.C. § 4022(b).  As indicated by the statutory language, any participation by a community is completely voluntary.  *Id.*  If a community chooses to adopt more stringent land use measures, FEMA will provide discounts on the flood insurance premiums of policyholders in the community.  42 U.S.C. § 4022(b).  FEMA establishes the CRS creditable activities and encourages communities to participate in the program, but any decision to participate is left to the sole judgement of a willing community.  *Id.*

In addition to providing flood insurance and reducing flood damages through floodplain management, the NFIP identifies and maps the nation's floodplains.  To assess flood hazards in a community, FEMA conducts Flood Insurance Studies (FISs) and publishes FIS reports that describe the flood hazards for the community.  *See generally* 44 C.F.R. § 59.1 (Definitions).

FEMA uses the information developed in the FIS to prepare Flood Insurance Rate Maps (FIRMs). *Id.* The FIRM is the basis for the floodplain management, insurance, and mapping activities of the NFIP. *See generally* 44 C.F.R. Title 44 Ch. 1 Part 59. Maps depicting flood hazard information are utilized to promote broad-based awareness of flood hazards, provide data for rating flood insurance policies, and determine the appropriate minimum floodplain management criteria for flood-prone areas.

Through its Flood Hazard Mapping Program, FEMA identifies flood hazards, assesses flood risks, and collaborates with States and communities to provide accurate flood hazard and risk data to guide them to mitigation actions. FEMA is required by statute to revise and update flood hazard maps (a) upon a determination that such revision or updates are necessary or (b) upon request from any State or community if accompanied by technical data sufficient to justify the requested change. 42 U.S.C. § 4101(f). The NFIA requires that FEMA identify flood-prone areas and subdivide them into flood risk zones to provide the data necessary for FEMA to determine the appropriate minimum floodplain management criteria and to rate flood insurance policies. 42 U.S.C. § 4101(a). While a variety of flood zones are mapped on FIRMs, the 100-year flood (or 1-percent-annual-chance flood) is the standard used for implementation of the NFIP. *See* 44 C.F.R. § 59.1 (definition of "base flood"). The area subject to the 1-percent-annual-chance flood is known as the Special Flood Hazard Area (SFHA). *See id.* (definition of "area of special flood hazard). Any property located within the SFHA is subject to the minimum criteria discussed above. 44 C.F.R. § 60.3(c). Maps depicting flood hazard information are utilized to promote broad-based awareness of flood hazards, provide data for rating flood insurance policies, and determine the appropriate minimum floodplain management criteria for flood-prone areas. FEMA publishes the FIRMs for distribution to a wide range of users:  private

5

citizens, community officials, insurance agents and brokers, lending institutions, and other Federal agencies.

FEMA is not authorized by statute to act as a permitting authority; to the contrary, FEMA has no land use authority.  The power to regulate floodplain development, including requiring and approving permits, inspecting property, and citing violations, requires land use authority. The regulation of land use falls under the State's police powers, which the Constitution reserves to the States, U.S. CONST. AMEND. X, and the States delegate this power down to their respective political subdivisions.  *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905).  Therefore, floodplain development is regulated at the community level through the community's floodplain management regulations and floodplain development permitting process.

Before a property owner can undertake any development in a Special Flood Hazard Area (SFHA), they must obtain a permit from the community.  The community is responsible for reviewing the proposed development to ensure compliance with their floodplain management ordinance and that all necessary permits have been received from Federal or State agencies from which approval is required.  44 C.F.R. § 60.3(a)(2).  FEMA has no knowledge of any community-issued permits in the SFHA until subsequent community monitoring efforts occur. In sum, FEMA's role under the NFIP is limited to mapping flood hazards, enrolling communities in the NFIP, setting the minimum floodplain management criteria, providing programmatic monitoring and oversight, providing technical assistance to ensure that communities are complying with the NFIP program requirements, and enforcing the program requirements when there are issues of programmatic non-compliance by a participating community.

## II.    <u>The Endangered Species Act</u>

The ESA provides for listing species as "threatened" or "endangered" if warranted, as

well as for designation of their "critical habitat."  16 U.S.C. § 1533(a).  Once a species is listed, ESA Section 7(a)(2) provides that federal agencies must ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical. . . ."  *Id.* § 1536(a)(2).  "Secretary" as used in the ESA means the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), respectively.  *Id.* § 1532(15).[1]  The ESA requires the action agency to consult with NMFS or FWS whenever a federal action "may affect" an endangered or threatened species.  50 C.F.R. § 402.14(a).

Section 7 of the ESA and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities.  16 U.S.C. § 1536(b); 50 C.F.R. Part 402.  The ESA consultation process is described at 50 C.F.R. §§ 402.10-402.16.  As further explained in the Endangered Species Act Section 7 Consultation Handbook (USFWS and NMFS 1998) at E-13, available at http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited Sept. 5, 2017), a "programmatic consultation" may address multiple actions on a program, regional, or other basis.

Through the consultation process, the action agency, assisted by NMFS and/or FWS, evaluates its action to determine whether it may affect a listed species, or the designated critical habitat of a listed species.  To this end, an action agency sometimes prepares a document called a

---

[1]  In general, FWS has authority over terrestrial species and NMFS has authority over marine species.  *See, e.g., Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1065 (9th Cir. 1995).

"biological assessment" to assess whether an action is likely to adversely affect listed species. 50 C.F.R. § 402.12(a).  A biological assessment refers to "the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation [of] potential effects of the action on such species and habitat."  50 C.F.R. § 402.02.  The consultation regulations further provide that "[t]he contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action."  50 C.F.R. § 402.12(f).

"Formal" ESA consultation culminates in the issuance of a "biological opinion" by NMFS or FWS, which advises the action agency whether jeopardy is likely to occur for any listed species, whether critical habitat is likely to be destroyed or adversely modified, and, if so, whether "reasonable and prudent alternatives" (RPAs) exist to avoid a jeopardy or adverse modification situation.  50 C.F.R. § 402.14(h)(3).  RPAs are defined as actions that are consistent with the intended purpose of the proposed action, are within the action agency's legal authority and jurisdiction to implement, are economically and technologically feasible, and will avoid jeopardy and/or adverse modification of critical habitat.  50 C.F.R. § 402.02.  In response to an RPA, an action agency has a number of options, including modifying its proposed action to implement the RPA, developing alternative means of achieving the RPA's objectives, and seeking an ESA exemption.  *See Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193-94 (9th Cir. 1988); 50 C.F.R. § 402.15(c).  Per the Services' implementing regulations, after completion of formal consultation, the action agency must determine "whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion." 50 C.F.R. § 402.15(a).  When a "jeopardy" opinion with an RPA is issued, the action agency must "notify the Service of its final decision on the action."  *Id.* § 402.15(b).  The regulations do

not provide any deadline for the action agency's response.  *Id.*

Section 9 of the ESA prohibits the "taking" of any endangered or threatened species.  16 U.S.C. § 1538(a)(1)(B).  "Take" as defined by the ESA means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in such conduct.  16 U.S.C. § 1532(19).  The ESA's prohibition on taking species applies to all "persons,"– including individuals, corporations, and federal or state agencies–upon the final listing of a species.  16 U.S.C. § 1532(13).  However, takings incidental to federal actions can be authorized as part of the consultation process in an incidental take statement (ITS) attached to a biological opinion.  16 U.S.C. § 1536(b)(4).  Under Section 7(o) of the ESA, "any taking that is in compliance with the terms and conditions specified in [an incidental take statement] shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(2).  Alternatively, a person may obtain an exemption from the endangered species take prohibition of ESA Section 9 by obtaining a permit from FWS or NMFS pursuant to ESA Section 10(a).  FWS or NMFS may provide such an authorization if the "take" is incidental to otherwise legal conduct and if the take "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  16 U.S.C. § 1539(a)(1)(B), 1539(a)(2); *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 83 (D.C. Cir. 2011); *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir. 1985).

The citizen-suit provision of the ESA authorizes citizen enforcement suits, which allow any person to commence a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the Act] or regulation issued under the authority thereof...."  16 U.S.C. § 1540(g)(1)(A).  The Supreme Court has also recognized that certain claims challenging the

9

merits of a biological opinion issued by NMFS or FWS, although not reviewable under the ESA's citizen suit provision, are subject to review under the arbitrary and capricious standard of the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Bennett v. Spear*, 520 U.S. 154, 175 (1997).

## III.    The National Environmental Policy Act

The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq*. (NEPA) establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321. "NEPA itself does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Rather, NEPA imposes only procedural requirements on federal agencies to take a hard look at the environmental impact of their proposals and actions. *See id*. at 349–350*; see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–58 (2004).

NEPA requires federal agencies to consider the environmental effects of certain federal actions prior to making decisions, through the generation of an Environmental Assessment (EA) and, if necessary, an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989); 40 C.F.R. § 1501.1. The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement. *See* 40 C.F.R. § 1500.3. The CEQ regulations allow an agency to prepare an EA if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS. *See* §§

10

1501.4(a)-(b). The EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." § 1508.9(a).  If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a "finding of no significant impact" (FONSI), which explains why the proposed agency action will not have a significant impact on the human environment.  *See* §§ 1501.4(e), 1508.13.

## IV.    The Administrative Procedure Act

The APA identifies who may challenge agency action and what actions may be challenged. Section 702 provides a cause of action for those suffering actual injury as a result of agency action.  5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  Section 704 establishes that only "final agency action" can form the basis of a court challenge.  5 U.S.C. § 704 ("Agency action made reviewable by statute *and final agency action for which there is no other adequate remedy in a court* are subject to judicial review.") (emphasis added).  Moreover, only one suffering actual or threatened injury as a result of a final agency action has standing to bring a challenge under section 706(2) of the APA for arbitrary and capricious agency action. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). "Final agency action" is the consummation of the agency's decisionmaking process from which "legal consequences will flow" or "rights or obligations have been determined." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  Similarly, a party only has standing to bring a claim under section 706(1) of the APA to "compel agency action unlawfully withheld or unreasonably delayed" when it can show that it has suffered actual or threatened injury as a result of an agency's failure to take a "*discrete* agency action that it is *required to take.*"  *Norton v. S. Utah*

11

*Wilderness Alliance,* 542 U.S. 55, 64 (2004) (emphasis in original).  Only an allegation identifying final agency action, or an allegation of failure to take discrete action that the agency is required to take, provides the court the authority to review the case under the APA.  *Id.*

## FACTUAL BACKGROUND

On April 14, 2016, in response to ESA consultation initiated by FEMA pursuant to the settlement in *Audubon Society of Portland v. FEMA*, Case No. 3:09-cv-729-HA (D. Or.) (filed herewith as Exhibit 2), NMFS issued a biological opinion (filed herewith as Exhibit 3) concerning the effects of FEMA's administration of the National Flood Insurance Program in Oregon.[2]  *See* Complaint ECF No. 1 ¶ 62.  Among other findings, the biological opinion concluded that FEMA's administration of the NFIP is likely to jeopardize the continued existence of 16 ESA-listed anadromous fish species and Southern Resident killer whales.  The biological opinion included an RPA with six elements that NMFS recommended FEMA undertake to avoid jeopardizing the 16 species.

RPA Element 1 calls for FEMA to develop an education and outreach strategy for RPA implementation and to provide notice to all NFIP participating communities in Oregon regarding the outcome of the agency's consultation and the substance of the RPA.  FEMA sent notice letters to participating communities pursuant to this RPA on June 13, 2016.  *See* Exhibit 1 Attachment 1.  FEMA's notice letter included guidance on how to elevate structures by methods other than fill, as stipulated under RPA Element 1.  *See id.*

RPA Element 2 calls for interim measures to reduce the loss of floodplain habitat features and functions as the long-term measures laid out in Elements 3-6 of the RPA are phased in. The

---

[2] On January 24, 2017, NMFS issued a clarification and errata to the RPA (filed herewith as Exhibit 4).

RPA also specifies that all development be mitigated to achieve "no net loss of natural floodplain functions." NMFS calls for implementation of this RPA element by March 15, 2018.

RPA Element 3 calls for FEMA to implement specific program standards to identify and map flood hazard areas and flood related erosion hazard areas.  For example, the RPA contemplates that FEMA will undertake new modeling analyses to assess flood hazard areas. The RPA calls for implementation of this RPA element by March 15, 2018 for sub-elements 3.A and 3.E; September 15, 2019 for sub-elements 3.B, 3.B, 3.D, 3.F, and 3.G.

RPA Element 4 calls for FEMA to undertake revisions to its regulatory floodplain management criteria to avoid, minimize, and mitigate the adverse effects of floodplain development on remaining habitat functions and processes. The RPA specifies that FEMA will revise its regulations at 44 C.F.R. Part 60 to incorporate an ESA performance standard into the regulatory floodplain management criteria required as a condition of NFIP eligibility in Oregon. NMFS calls for implementation of this RPA element by January 1, 2019 for any components of Element 4 that FEMA determines can be implemented without regulatory revisions and January 1, 2021 for any components of this RPA that FEMA determines require regulatory revisions.

RPA Element 5 sets forth data collection and reporting procedures for FEMA to monitor all participating communities and collect and report floodplain development information. The RPA provides for community reporting to FEMA concerning permits issued for development in special flood hazard areas on a quarterly basis and that FEMA report to NMFS annually on RPA implementation status.  NMFS calls for implementation of this RPA element by March 15, 2018.

RPA Element 6 sets forth compliance and enforcement provisions under which FEMA may ensure that participating communities in Oregon are compliant with the floodplain

management criteria pursuant to the RPA. NMFS calls for full compliance by communities subject to the RPA by September 1, 2024.

In response to the NMFS biological opinion, on May 4, 2016, FEMA's Assistant Administrator for Mitigation, Michael M. Grimm, sent a letter (filed herewith as Exhibit 1 Attachment 3) to NMFS's Assistant Regional Administrator, Kim Kratz providing FEMA's preliminary response to the opinion and RPA.  *See also* Complaint, ECF No. 1 ¶ 75.  In the letter, FEMA acknowledged receipt of the biological opinion, noted that FEMA had concerns regarding its legal authority to implement some of the RPA elements, and stated that "FEMA is looking comprehensively at the NFIP to determine how to implement the RPA and the conservation recommendations, and to ensure continued compliance with the ESA."  Exhibit 1 Attachment 3.  Nevertheless, despite FEMA's concerns regarding its legal authority to implement some aspects of the RPA, FEMA stated that as a good steward of the environment it will "take steps, consistent with the requirements of the RPA, to use its legal authorities under the National Flood Insurance Act for the benefit of ESA-listed species and their habitat, as well as the floodplain functions that support such species and habitat."  *Id.*

Other than sending letters to the participating communities pursuant to RPA Element 1, FEMA has implemented no provisions of the RPA.  As explained in correspondence to members of Oregon's congressional delegation dated July 14, 2016 (letters filed herewith as Exhibit 1 Attachment 3), FEMA's letter to participating communities "was not intended to communicate the initiation of any immediate implementation obligations under the RPA absent further FEMA guidance."  To develop such RPA implementation guidance, FEMA convened a series of ten workshops with Oregon communities and other stakeholders during June-July 2016 to determine

how to implement the RPA.  *See id.*  Some of the Plaintiffs and their counsel have participated in some of these implementation workshops.  *See* Grimm Decl., Exhibit 1 ¶ 12.

On November 23, 2016, a coalition including the Plaintiff Oregon Home Builders Association (OHBA) sent a letter to FEMA, *see* Complaint Exhibit 2, ECF No. 1-3, notifying FEMA of its intent to bring a suit challenging FEMA's implementation of the RPA pursuant to the ESA's citizen suit provision.  The coalition also provided notice to the Secretary of Commerce concerning its intent to challenge the biological opinion.  *See* Complaint Exhibit 1, ECF No. 1-2.  The coalition submitted a follow-up letter dated April 20, 2017 (filed herewith as Exhibit 5).  In response, FEMA sent a letter to Plaintiffs' counsel, Ms. Lawrence, dated May 22, 2017 (filed herewith as Exhibit 6).  FEMA stated that it continues to develop its RPA implementation plan.  "We have not yet concluded that process, but we intend to keep the public apprised of our implementation plans."  At this time, as set forth in the Declaration of Michael Grimm, FEMA is still in the process of determining how to implement the RPA in a manner consistent with its existing legal authorities and in consideration of input gathered from state and local stakeholder groups in Oregon.  Grimm Decl., Exhibit 1 ¶¶ 10-14.

Plaintiffs filed this lawsuit on June 15, 2017.  ECF No. 1.  Plaintiffs include Oregonians for Floodplain Protection, Oregon Home Builders Association, and National Association of Home Builders.  *Id.* ¶¶ 10, 15, and 17.  Several members of the Oregonians for Floodplain Protection are allegedly NFIP participating communities in Oregon.  *Id.* ¶ 11.

## STANDARD OF REVIEW

Before the Court can consider the merits of Plaintiffs' Complaint, it must first determine whether Plaintiffs have properly invoked the Court's jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any

15

cause.")  Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed

for lack of subject matter jurisdiction if the action: "does not 'arise under' the Federal

Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III,

S[ection] 2, [of the Constitution], or is not a case or controversy' within the meaning of that

section; or the cause is not one described by any jurisdictional statute." *Baker v. Carr*, 369 U.S.

186, 198 (1962).  One prerequisite to a court's exercise of subject matter jurisdiction is that a

plaintiff have standing.  *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,* 417 F.3d

1272, 1286 (D.C. Cir. 2005).  Plaintiffs bear the burden of establishing each element of standing,

and standing is determined on a claim-by-claim basis.  *Lujan v. Defenders of Wildlife,* 504 U.S.

555, 561 (1992); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006).  Because federal

courts are courts of limited jurisdiction, the presumption is that a party lacks jurisdiction unless

the contrary appears affirmatively from the record.  *Kokkonen v. Guardian Life Ins. Co. of Am.*,

511 U.S. 375, 377 (1994).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of

demonstrating subject matter jurisdiction.  *See Erby v. United States*, 424 F. Supp. 2d 180, 182

(D.D.C. 2006).  The Court must accept the factual allegations of the Complaint as true, and must

give Plaintiffs the benefit of all inferences to be drawn from those allegations.  *See Best v. United

States*, 522 F. Supp. 2d 252, 254-55 (D.D.C. 2007); *Kimberlin*, 150 F. Supp. 2d at 41.  The Court

need not, however, accept Plaintiffs' legal conclusions as true.  *Ashcroft v. Iqbal*, 556 U.S. 662,

677-78 (2009); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

"[T]he district court may consider materials outside the pleadings in deciding whether to grant a

motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249,

1253 (D.C. Cir. 2005).

## ARGUMENT

### I.   Plaintiffs Have Not Met Their Burden to Demonstrate Article III Standing.

Plaintiffs have failed to provide sufficient allegations to demonstrate constitutional

standing under Article III.  Plaintiffs' Complaint fails to identify an injury-in-fact derived from

any specific action taken by FEMA or a participating community as part of RPA implementation.

For example, Plaintiffs allege that "NFIP participating community members are being coerced to

limit development within their floodplains by the Biological Opinion and FEMA's current and

ongoing implementation of the RPA."  Complaint ECF No 1 ¶ 11.  Plaintiffs further allege that

association members' ability to use their property will be impacted because implementation of

the RPA will limit development on property located in floodplains."  *Id.* ¶ 16.  However,

Plaintiffs' complaint does not identify any specific development project that has been curtailed

by implementation of the RPA.  This is hardly surprising, because FEMA has not begun

implementing RPA Element 2 or any other RPA elements that Plaintiffs allege are causing their

injuries.  Under the circumstances, Plaintiffs' assertions concerning development restrictions that

will allegedly result from the RPAs are entirely speculative.  To the extent that Plaintiffs allege

some procedural injury resulting from a *de facto* amendment of FEMA's regulatory authority to

condition community participation in the NFIP, Plaintiffs have not been injured because FEMA

has not yet undertaken any changes to community eligibility requirements, *de facto* or otherwise.

Article III standing is an "irreducible constitutional minimum" for federal court

jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "Standing under Article

III of the Constitution requires that an injury be concrete, particularized, and actual or imminent;

fairly traceable to the challenged action; and redressable by a favorable ruling."  *Monsanto Co. v.*

*Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *accord Summers v. Earth Island Inst.*, 555 U.S.

488 (2009); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, Inc., 528 U.S. 167, 180-81

(2000); *Lujan*, 504 U.S. at 561.  To meet the Constitution's standing requirements to sue as

associations on behalf of their members, the plaintiff-associations in this case must demonstrate

that one or more of their members would have standing to sue in their own right.  *See Friends of*

*the Earth*, 528 U.S. 181. Plaintiff-associations may also attempt to demonstrate that the

organizations themselves have been harmed.  *See Havens Realty Corp. v. Coleman*, 455 U.S.

363, 378 379 (1982).

      The injury-in-fact element of standing requires a showing that an association or at least

one member has suffered or will suffer an actual or imminent concrete and particularized injury-

in-fact.  *See Lujan*, 504 U.S. at 560–61.  This is so because the "judicial Power" conferred by

Article III "'exists only to redress or otherwise to protect against injury to the complaining party,'

not to review the legality of governmental conduct in a vacuum."  *Coal. for Mercury-Free Drugs*

*v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 499

(1975)).  A plaintiff must have a "personal stake in the outcome of the controversy" that would

"justify exercise of the court's remedial power on his behalf."  *Warth*, 422 U.S. at 498–99

(citation omitted).

      To the extent that Plaintiffs here allege an "informational injury" because of a purported

denial of their rights to notice and opportunity to participate before FEMA makes changes to its

program, see Complaint, ECF No. 1 at ¶ 18, such injury must be must be concrete and

particularized, rather than "generalized."  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23

(1998).  Similarly, in cases of alleged "procedural injury," a plaintiff must show that the alleged

procedural violation "will cause a distinct risk to a particularized interest of the plaintiff."

*Florida Audubon Soc'y v. Bensten*, 94 F.3d 658, 664 (D.C. Cir. 1996) (*en banc*); *Defenders of*

*Wildlife*, 504 U.S. at 572-74.  *See also Summers v. Earth Island Inst.*, 555 U.S. at 496

("[D]eprivation of a procedural right without some concrete interest that is affected by the

deprivation—a procedural right in vacuo—is insufficient to create Article III standing."

Regardless of the type of injury alleged, a plaintiff "bears the burden of showing that he

has standing for each type of relief sought."  *Summers*, 555 U.S. at 493.  "At the pleading stage,

general factual allegations of injury resulting from the defendant's conduct may suffice, for on a

motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are

necessary to support the claim.'"  *Lujan*, 504 U.S. at 501 (quoting *Lujan v. Nat'l Wildlife Fed'n*,

497 U.S. 871, 889 (1990)).  Here, Plaintiffs fail to allege facts sufficient to establish that they

face any imminent injury as a result of Defendants' actions.

Rather than identifying any actual or imminent concrete and particularized injury-in-fact,

the alleged injuries cited in Plaintiffs' complaint are entirely speculative.  For example, the NFIP

participating communities that are members of Oregonians for Floodplain Protection state that

they "are concerned that if they do not comply with FEMA's direction to implement the RPA,

particularly Element 2, FEMA will suspend or terminate them from the NFIP."  Complaint, ECF

No. 1 at ¶ 11.  However, as explained above, FEMA has not yet implemented RPA Element 2, or

any other RPA elements, other than sending an initial letter that notified participating

communities about the biological opinion pursuant to RPA Element 1 and attaching guidance on

how to elevate structures by means other than fill.  Grimm Decl., Exhibit 1 ¶ 7.  There is

currently no basis for Plaintiffs' stated concerns about obligations resulting from potential future

implementation of an RPA.  FEMA does not expect to implement the provisions of RPA Element

2 until 2018.  Grimm Decl., Exhibit 1 ¶ 9.  Moreover, FEMA has not yet determined how it will

implement RPA Element 2 in a manner that reflects the input of affected stakeholders and

FEMA's view as to its existing legal authorities.  Grimm Decl., Exhibit 1 ¶ 10.  It follows that there no basis for concern over the potential suspension or termination of NFIP for failure to comply with eligibility requirements not yet implemented.

Plaintiff National Association of Homebuilders (NAHB) asserts that its "members' ability to use their property and their property values will be impacted because implementation of the RPA will limit development on property located in floodplains." Complaint, ECF No. 1 at ¶ 16.  Similarly, Plaintiff OHBA states that its members have suffered injuries as a result of the biological opinion and FEMA's implementation of the RPA of the types allegedly suffered by Oregonians for Floodplain Protection and NAHB.  Complaint, ECF No. 1 at ¶ 17.  Such alleged injuries cannot suffice for purposes of standing, because FEMA has not yet done anything pursuant to the RPA to limit development on property located in floodplains and does not plan to do so until it finalizes its assessment concerning its authorities to implement the RPA.  Grimm Decl., Exhibit 1 ¶ 10.  Therefore, none of the Plaintiffs here can identify any specific property that is, or could imminently be, subject to a development restriction pursuant to the RPA.  Plaintiffs' abstract concerns about future RPA implementation, standing alone, are not a substitute for Article III's injury-in-fact requirement.  *See Sierra Club v. Morton*, 405 U.S. 727, 738–40 (1972).  See *also Western Wood Preservers Inst. v. McHugh,* 925 F. Supp. 2d 63, 70 (D.D.C. 2013) ("[B]ecause plaintiffs have not identified any specific member firm to have suffered the alleged harm, they do not have standing to sue on behalf of their members in a representational capacity."), *reconsid. denied,* 292 F.R.D. 145, 148 (D.D.C. 2013); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 170 F. Supp. 3d 6, 14 (D.D.C. 2016) ("Plaintiffs have not stated an imminent concrete injury threatened by future [nationwide permit] 13 projects.").

To the extent that Plaintiffs allege that the challenged agency actions result in a

procedural injury, the Supreme Court has recognized that a party may demonstrate standing based on alleged violation of a procedural interest in certain circumstances where "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Defenders of Wildlife*, 504 U.S. at 573 n.8. However, the mere violation of a procedural requirement does not permit any and all persons to sue to enforce the requirement. *Florida Audubon Soc'y*, 94 F.3d at 663. "[T]he Court has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Id.* Thus, it is not enough for Plaintiffs here to allege that their members' interests are harmed because they did not (or would not) have the opportunity to submit public comments on an alleged *de facto* amendment of 44 C.F.R. § 60.3(a)(2) that has not occurred. Plaintiffs must allege some concrete interest that is affected by the deprivation of their asserted procedural rights. *Summers*, 555 U.S. at 496. *See also Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 114 (D.D.C. 2015) (Plaintiff "has not explained how the Department's deprivation of information has caused it any concrete harm."); *Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235 (D.C. Cir. 2015) ("The companies' declarations do not state that the [Owl Estimation Methodology] otherwise has been used to reduce timber offered for sale that the companies would purchase."). Plaintiffs here have failed to demonstrate any impairment to some concrete interest as a result of the alleged violation of their informational or procedural rights. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) ("The procedural injury the Appellants claim . . . is tied to their respective members' concrete aesthetic and recreational interests.").

As to causation, Plaintiffs must show that "'it is substantially probable . . . that the

challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff.'" *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 663). To the extent that Plaintiffs NAHB and OHBA allege injuries resulting from RPA implementation by participating communities,[3] these Plaintiffs fail to allege that their injuries would be caused by actions of FEMA or NMFS respectively, as opposed to actions by the participating communities themselves. This remote and indirect causation between the disputed agency actions to date (*i.e.*, NMFS's issuance of a biological opinion and FEMA's act of sending letters to communities to notify them about NMFS's biological opinion) and any injury to Plaintiffs is insufficient for purposes of standing. "Such a causal chain cannot adequately establish causation because [Plaintiffs] rely on the speculation that various different groups of actors not present in this case" – namely the actual permittees, their contractors, and customers – "might act in a certain way in the future." *Ctr. for Biological Diversity*, 563 F.3d at 479.

As to redressability, a plaintiff should "precisely trace the connection between injury and relief" because it is not up to a court to construct a "plausible scenario whereby an order of this court might provide relief for injuries not specifically pleaded." *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 974-75 (D.C. Cir. 1988). Where, as here, numerous third parties and independent variables lead to an alleged injury, the plaintiff has the burden of showing that, but for the particular governmental action that is challenged, the injury would abate. *Id.* at 980. Moreover, a plaintiff must show that it is "'likely,' as opposed to merely

---

[3] As provided under Section 7(o) of the ESA, 16 U.S.C. § 1536(o), communities that voluntarily implement the RPA may obtain an exemption from liability for any "take" of listed species associated with floodplain development under the terms of the incidental take statement included in the biological opinion.

'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Defenders of Wildlife*,

504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38 (1976)).

 *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997), held that an alleged injury resulting from

a FWS biological opinion was fairly traceable for standing purposes in light of the "coercive

effect" of the biological opinion in that case.  *Bennett* is distinguishable from the facts here.  The

agency in *Bennett* had "notified the Service that it intended to operate the project in compliance

with the Biological Opinion."  *Id.* at 159.  Here, by contrast, FEMA has repeatedly and

consistently stated that it continues to evaluate the RPA, its legal authority to implement some

aspects of the RPA, and implementation options, is in the process of seeking input from affected

Oregon communities on its implementation plan, and has not yet made a determination as to how

it will proceed.  *See, e.g.* Grimm Decl., Exhibit 1 ¶ 10; Exhibit 1 Attachment 3 (FEMA letter in

response to biological opinion).  Just as Plaintiffs cannot show that their alleged, speculative

injuries are caused by the RPA at issue here, there is nothing in Plaintiffs' Complaint to

substantiate their assertion that a court order "would redress Plaintiffs' injuries by ensuring that

environmental objectives of the ESA are pursued in light of the actual impacts of the NFIP and

with appropriate reference to FEMA's authority and economic consequences."  Complaint, ECF

No. 1 at ¶ 21.  *See Cal. Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 17-18 (D.D.C. 1996) (noting

that, "it must be likely, as opposed to merely speculative, that the injury claims will be redressed by a

favorable decision.") (citations and quotations omitted).  For these reasons, and for the reasons set

forth below with respect to Defendants' ripeness arguments, Plaintiffs' alleged injuries are not fairly

traceable to the biological opinion or any alleged actions or inactions by FEMA.

 In sum, the plaintiff-associations fail to allege that their interests – either their own interests

or those of their members – will be harmed by the actions of NMFS or FEMA to date.  Plaintiffs

cannot credibly allege such injuries because FEMA has not yet determined whether or how to begin

implementing the specific RPA elements that Plaintiffs allege will be harmful to their interests. *See* Grimm Decl., Exhibit 1 ¶ 10. All claims in Plaintiffs' Complaint against both NMFS and FEMA should be dismissed for lack of standing.[4]

## II.   Principles Of Finality and Ripeness Preclude Review Of Claims Concerning FEMA's Implementation of the RPA.

Because FEMA has not yet begun to implement the RPA elements to which Plaintiffs object, principles of finality and ripeness preclude this Court's review of Plaintiffs' claims against FEMA.

### A.   Plaintiffs Fail To Direct Their Count Five and Count Six Claims Against Any Final Agency Action.

The Supreme Court set forth the criteria for final agency action in *Bennett v. Spear*, 520 U.S. 154 (1997). The Court explained that, as a general matter, two conditions must be satisfied for agency action to be "final." First, the action "must mark the 'consummation' of the agency's decisionmaking process," and not be "of a merely tentative or interlocutory nature." 520 U.S. at 177-78. Second, the action "must be one from which 'rights or obligations have been determined,' or from which 'legal obligations will flow.'" *Id.* (citations omitted). Absent a specific final agency action, jurisdiction to consider Plaintiffs' claims is lacking. *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). *Bennett* held that a biological opinion is a final, reviewable agency action as to the wildlife agency, *see* 520 U.S. at 175, but it does not follow that the action agency's ongoing review of potential options for implementing a biological opinion's recommendations is also reviewable. Applying the *Bennett* criteria, FEMA's provision

---

[4] To the extent that any claims solely against the U.S. Department of Commerce survive this motion to dismiss, Defendants may move to transfer this action to the United States District Court for the District of Oregon, where the settlement agreement was entered in the case of *Audubon Society of Portland v. FEMA*, Case No. 3:09-cv-729-HA and where NMFS issued the challenged biological opinion.

of notice to communities pursuant to RPA Element 1 does not constitute a final agency action with respect to even that RPA Element, much less as to the remaining RPA Elements.

As to the first prong of the *Bennett* test, FEMA's initial steps of providing information about the RPA to Oregon NFIP communities as outlined in RPA Element 1 do not mark the consummation of FEMA's decisionmaking process with respect to FEMA's implementation of the RPAs. To date, FEMA has taken no action with respect to Plaintiffs' Count Five claims beyond sending letters to NFIP-participating communities to notify them about the biological opinion and provide guidance on how to elevate structures by methods other than fill for developers that opt to do so. *See* Grimm Decl., Exhibit 1 ¶ 7. FEMA, however, is still in the process of determining how it may implement NMFS's recommendations with respect to RPA elements two through six. FEMA has not yet decided to implement any specific changes to the existing NFIP eligibility criteria set forth in 44 C.F.R. § 60.3(a)(2). Moreover, FEMA has expressly stated that it is still working to develop a path forward, and that it will "provide an official response to NMFS" when it has done so. *See* Exhibit 1 Attachment 3 (FEMA response to biological opinion).

Likewise, with respect to Plaintiffs' Count Six claims, FEMA has not taken any final action and therefore has not triggered any NEPA compliance that may be required. "Because FEMA has neither implemented any part of Elements 2-6 of the RPA, nor finalized an implementation plan with respect to those Elements, FEMA has determined that no NEPA compliance or rulemaking is necessary at this time." Grimm Decl., Exhibit 1 ¶ 14.

As noted above, the Supreme Court observed in *Bennett* that a biological opinion "has a powerful coercive effect on the action agency." *Bennett*, 520 U.S. at 169. However, despite the significant role afforded the wildlife agency in recommending reasonable and prudent

alternatives, the action agency "has the primary responsibility for implementing section 7's substantive command."  51 Fed. Reg. 19,926, 19,928 (June 3, 1986).  Thus, the ultimate decision whether and how to proceed with the proposed action is committed to the discretion of the action agency.  *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976); *Sierra Club v. Froehlke*, 534 F.2d 1289, 1303 (8th Cir. 1976).

Given the complexity of the NFIP and the RPA at issue here, as well as the numerous interests involved, FEMA is carefully evaluating the RPA and implementation options.  *See* Grimm Decl, Exhibit 1 ¶ 10.  Unlike the agency in *Bennett*, which had already agreed to implement the biological opinion, *see* 520 U.S. at 159, it is possible that FEMA may pursue alternative measures to comply with the RPA in a manner consistent with its existing legal authorities.  *See* Grimm Decl, Exhibit 1 ¶ 10.  Indeed, it is well settled that in response to RPAs recommended by FWS or NMFS, the action agency may lawfully elect to satisfy the requirements of section 7 by taking "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193-94 (9th Cir. 1988); *see also San Luis & Delta-Mendota Water Authority v. Jewell,* 747 F.3d 581, 643 (9th Cir. 2014); *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1146-47 (S.D. Tex. 1996); *N. Slope Borough v. Watt,* 1984 U.S. Dist. LEXIS 20755, (D. Alaska, 1984); *Natural Res. Defense Council, Inc. v. United States Army Corps of Eng'rs*, 2001 WL 1491580, at *3 (S.D. Fla. June 28, 2001).  In sum, FEMA has not yet determined which of the RPA elements it will implement, how they may be implemented, and what, if any, alternative steps may be appropriate to comply with FEMA's obligation to avoid jeopardy to species and destruction or adverse modification of critical habitat.  Therefore, the first prong of the *Bennett* finality test is not met because FEMA has not yet completed its decisionmaking

process concerning whether or how to implement the various RPA elements recommended by NMFS.

Plaintiffs' Counts Five and Six also fail the second prong of the *Bennett* finality test. FEMA's outreach activities in response to RPA Element 1 and ongoing evaluation of implementation options do not determine any rights or obligations of communities under FEMA's existing NFIP eligibility regulations, 44 C.F.R. § 60.3(a)(2) or any other authorities. Moreover, FEMA does not itself determine whether an NFIP-participating community authorizes any specific development in floodplains. Such local development decisions are made by the communities themselves. No changes to the NFIP's eligibility criteria, as established under the NFIA, have occurred simply because NMFS has recommended them in a biological opinion, and FEMA has not notified Oregon communities of any specific changes to the eligibility criteria.

Plaintiffs cite the biological assessment produced by FEMA as part of the ESA consultation process *prior to* issuance of the RPA (filed herewith as Exhibit 7) in support of their assertion that FEMA has undertaken a *de facto* amendment of the NFIP eligibility regulations to require communities to obtain a "permit for take" if the potential for take exists as a result of a proposed development permit.[5] *See* Complaint, ECF No. 1 at ¶¶ 81-82. However, a biological assessment is not itself a final agency action reflecting "consummation of the agency's decision making process" or an action "from which legal consequences will flow." *Bennett*, 520 U.S. at

_____

[5] It is hardly surprising that FEMA would note that, in some circumstances, a municipality may have its own obligation to obtain a permit from NMFS where proposed development may result in "take" of ESA-listed species. Several courts have found that a local government or other regulatory entity may be liable for ESA violations resulting from take of species by third parties under a theory of proximate causation. *Loggerhead Turtle v. County Council of Volusia County, Florida,* 148 F.3d 1231, 1250-52 (11th Cir. 1998) (discussing *Strahan v. Coxe,* 127 F.3d 155, 158 (1st Cir. 1997) and *Defenders of Wildlife v. Administrator, EPA,* 882 F.2d 1294, 1300-01 (8th Cir. 1989)).

177–78.  *See also Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 995 (D. Or. 2010)

(rejecting challenge to biological assessments, finding that, under *Bennett*, "the assessments did

not mark the consummation of the agency's decisionmaking and were not actions from which

legal consequences flowed"); *Western Watersheds Project v. Bureau of Land Mgmt.*, 552 F.

Supp. 2d 1113, 1141 (D. Nev. 2008) (holding that a biological assessment was not final agency

action subject to judicial review); *Defenders of Wildlife v. Babbitt,* 130 F. Supp. 2d 121, 126, n.4

(D.D.C. 2001) (dismissing claims alleging the inadequacy of the BA for the Sonoran pronghorn

because content of the biological assessment is discretionary); *Bays' Legal Fund v. Browner*, 828

F. Supp. 102, 110 (D. Mass. 1993) (holding that EPA's completion of Draft SEIS and Final SEIS

satisfied requirement for completion of a biological assessment prior to award of construction

contract, because contents of BA are discretionary with the agency preparing it).

Other than the biological assessment, Plaintiffs do not cite other actions through which

FEMA has purportedly implemented a *de facto* amendment of the NFIP eligibility regulations.

Unless and until FEMA takes such actions, FEMA's statements concerning potential avenues for

NFIP participating communities to ensure compliance with the ESA are not yet at the point

where "legal consequences flow."  *See Bennett*, 520 U.S. at 177-78.  Since Plaintiffs have not

challenged final agency action on the part of FEMA, this court lacks jurisdiction to consider

Plaintiffs' fifth and sixth claims for relief.  *Cobell v. Norton*, 240 F.3d at 1095.

## B. <u>Plaintiffs' Fifth and Sixth Claims For Relief Are Not Ripe for Review</u>.

Assuming for the sake of argument that FEMA's proposal to begin implementing certain

elements of the NMFS's RPA is itself a reviewable final agency action, Plaintiffs' fifth and sixth

claims for relief nevertheless remain unripe for judicial review.  The ripeness doctrine is rooted

in both the Article III "case or controversy" requirement and in prudential considerations

favoring the orderly conduct of administrative and judicial processes.  *See Blanchette v.*

*Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 138 (1974).  The doctrine was developed "to

prevent the courts, through avoidance of premature adjudication, from entangling themselves in

abstract disagreements over administrative policies, and also to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete

way by the challenging parties."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  It

"reflects a judgment that the disadvantages of a premature review that may prove too abstract or

unnecessary ordinarily outweigh the additional costs of – even repetitive – postimplementation

litigation."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998).

> Application of the ripeness doctrine requires consideration of three factors:
>
> (1) whether delayed review would cause hardship to the plaintiffs; (2) whether
> judicial intervention would inappropriately interfere with further administrative
> action; and (3) whether the courts would benefit from further factual development
> of the issues presented.

*Ohio Forestry*, 523 U.S. at 733 (1998) (holding that facial challenge to a Forest Service plan, as

opposed to a specific project implementing a plan, was not ripe for adjudication).  *See also Nat'l

Park Hospitality Ass'n v. U.S. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (holding that facial

challenge to an administrative regulation of the Department of Interior was not ripe for

adjudication).  Applying these factors here demonstrates that Plaintiffs' fifth and sixth claims for

relief are unripe.

As to the first factor, under the Supreme Court's decision in *Toilet Goods Ass'n v.

Gardner*, 387 U.S. 158 (1967), the hardship test is satisfied only if the challenged administrative

action would have an immediate effect on the primary conduct of the petitioner.  *Nat. Res. Def.

Council v. EPA*, 859 F.2d 156, 166 (1988) (quotations omitted).  In this case, deferring judicial

review does not have any immediate effect on Plaintiffs.  As explained in detail above, Plaintiffs

fail to identify any specific development project that has been or will be delayed or otherwise affected as a result of any FEMA action.

As to the second factor, judicial intervention has already and will likely continue to interfere with FEMA's ability to take actions pursuant to the biological opinion.  As set forth in the declaration of Michael Grimm, the pendency of this litigation has already hindered FEMA staff's ability to coordinate with NFIP communities to develop an implementation plan.  *See* Grimm Decl., Exhibit 1 ¶ 13.

As to the third factor, this is clearly a situation in which the Court would benefit from deferring consideration of Plaintiffs' challenge until further factual development of the issues is presented.  To date, FEMA has not taken any actions to implement the RPA elements other than sending letters to the participating communities to acknowledge receipt of the biological opinion.  Plaintiffs cannot credibly assert that they were harmed by these actions and, indeed, they do not.  Under the circumstances, further factual development would "significantly advance [the Court's] ability to deal with the legal issues presented."  *See Nat'l Parks Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (citations omitted).  Without concrete, site-specific examples of how FEMA is implementing and enforcing the RPA, it is impossible to substantiate Plaintiffs' allegations that FEMA's actions have resulted in a *de facto* amendment to the existing NFIP eligibility criteria at 44 C.F.R. § 60.3(a)(2).  *See Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1385 (D.C. Cir. 1996) ("[W]e need to wait for a rule to be applied [to see] what its effect will be.") (citation and internal quotations omitted).  Merely alleging that the RPA results in business uncertainty for the plaintiff-associations does not make these claims ripe.  *Nat'l Parks Hospitality Ass'n*¸ 538 U.S. at 811 ("If we were to follow petitioner's logic, courts would soon be overwhelmed with requests for what essentially would be advisory opinions because

30

most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved.").  Rather than engage in speculation about FEMA's implementation plan, this Court is better served by deferring review until it can be conducted in a site-specific and concrete context.  Following the reasoning of binding Supreme Court precedent, Plaintiffs' fifth and sixth claims for relief are unripe.

Plaintiffs' sixth claim for relief concerning alleged NEPA violations is particularly unripe because FEMA has not yet failed to conduct an analysis of the environmental impacts under NEPA.  A NEPA claim becomes ripe only when the failure to follow NEPA occurs.  *See Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1264 (10th Cir. 2002).  Agency inaction typically does not trigger NEPA.  *See Cross-Sound Ferry Servs., Inc. v. ICC*, 934 F.2d 327, 334 (D.C. Cir 1991) ("agency must undertake some 'overt act' to trigger NEPA's requirements"). While federal inaction may occasionally constitute "major federal action" under CEQ's regulations, 40 C.F.R. § 1508.18, NEPA imposes no duty on federal agencies "where no Federal decisions are required and none have been made."  *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1247 n.6 (D.C. Cir. 1980).  A claim is not ripe where further consideration of the action prior to implementation is not merely theoretical, but real.  *See Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49-50 (D.C. Cir. 1999) ("the law does not require an agency to prepare an EIS until it reaches the critical stage of a decision which will result in 'irreversible and irretrievable commitments of resources' to an action that will affect the environment.") (quoting *Mobil Oil Corp. v. FTC*, 562 F.2d 170, 173 (2d Cir. 1977)); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) ("Petitioners' NEPA-based claims are not ripe due to the multiple stage nature of the Leasing Program.").  Here, Plaintiffs cannot assert that FEMA has failed to comply with NEPA because FEMA has not yet implemented any

changes to its administration of the NFIP pursuant to the RPA. Although FEMA is committed to complying with the requirements of NEPA at the appropriate time, it cannot practically do so prior to developing an implementation plan. Grimm Decl., Exhibit 1 ¶ 14. As noted in *Ohio Forestry*, a claim is not ripe where the "possibility that further consideration will actually occur before [implementation] is not theoretical, but real." 523 U.S. at 735.

In sum, FEMA's decision to implement Element 1 of the RPA does not entail any changes to the NFIP eligibility criteria set forth in 44 C.F.R. § 60.3(a)(2) or other specific actions that may trigger NEPA. FEMA does not anticipate taking such further actions until 2018. Grimm Decl., Exhibit 1 at ¶ 9. Because further factual development would assist the Court in evaluating the merits of Plaintiffs' claims, the Court should defer review of this case. However, should the Court find it appropriate to address Plaintiffs' claims concerning the merits of the biological opinion (*i.e.*, Plaintiffs' first, second, third, and fourth claims for relief), the Court should nevertheless dismiss Plaintiffs' fifth and sixth claims for relief as to FEMA.

## CONCLUSION

FEMA has not yet determined how it will implement NMFS's RPA elements or whether it will be necessary to implement measures to ensure the continued existence of ESA-listed species. For the foregoing reasons, Plaintiffs' complaint should be dismissed in its entirety because Plaintiffs fail to establish the requirements for constitutional standing. Plaintiffs' claims against FEMA must also be dismissed based on principles of ripeness and finality as FEMA has not undertaken a final agency action nor committed to a major federal action.

DATED this 8th day of September, 2017.

Respectfully submitted,

> JEFFREY H. WOOD
> Acting Assistant Attorney General
> Environment & Natural Resources Division
>
> SETH M. BARSKY, Section Chief
> MEREDITH L. FLAX, Assistant Section Chief
>
>
> *s/ Mark Arthur Brown*
> MARK ARTHUR BROWN
> D.C. Bar No. 470050
> Senior Trial Attorney
> U.S. Department of Justice
> Environment and Natural Resources Division
> Wildlife and Marine Resources Section
> P.O. Box 7611
> Washington, D.C. 20044-7611
> Telephone: (202) 305-0204
> Facsimile: (202) 305-0275
> mark.brown@usdoj.gov
>
> SARAH IZFAR
> U.S. Department of Justice
> Environment and Natural Resources Division
> Natural Resources Section
> P.O. Box 7611
> Washington, D.C. 20044-7611
> Telephone: (202) 305-0490
> Sarah.izfar@usdoj.gov
>
> Counsel for Defendants

Of Counsel:

SABRINA McBRIDE
RAZEYEH JAFARZADEH
Office of General Counsel
Federal Emergency Management Agency
500 C Street, S.W.
Washington, D.C.  20472
(202) 646-3235

LAURIE K. BEALE
Attorney-Advisor, Northwest Section
NOAA Office of General Counsel
U.S. Department of Commerce
7600 Sand Point Way NE
Seattle, WA 98115
(206) 526-6327

## <u>LIST OF EXHIBITS</u>

EXHIBIT 1 – Declaration of Michael Grimm

       ATTACHMENT 1 - Community Notification Letter

       ATTACHMENT 2 - Correspondence on RPA Implementation

       ATTACHMENT 3 - FEMA letter dated May 4, 2016, in response to biological opinion.

EXHIBIT 2 – Settlement in *Audubon Society of Portland v. FEMA*

EXHIBIT 3 – Biological Opinion

EXHIBIT 4 – RPA Errata

EXHIBIT 5 – OHBA follow-up letter to FEMA dated April 20, 2017

EXHIBIT 6 – FEMA letter to Plaintiffs' counsel, Ms. Lawrence, dated May 22, 2017

EXHIBIT 7 – FEMA Biological Assessment

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2017, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ *Mark Arthur Brown*
MARK ARTHUR BROWN