# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OREGONIANS FOR FLOODPLAIN
PROTECTION, *et al.*,

                           Plaintiffs;

          v.                                                   Civil Case No. 1:17-cv-01179-RJL

THE U.S. DEPARTMENT OF
COMMERCE, *et al.*,

                           Defendants.

---

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Molly Lawrence (WSBA Bar # 28236)
Michael D. Farber (D.C. Bar # 449215)
Van Ness Feldman LLP
1050 Thomas Jefferson St., N.W.
Washington, D.C. 20007
Telephone: (202) 298-1800
Facsimile: (202) 338-2416
mol@vnf.com
mfarber@vnf.com

*Attorneys for Plaintiffs*

Dated: September 22, 2017

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF THE FACTS .........................................................................2

   A.   The Biological Opinion ....................................................................................2

   B.   FEMA's De Facto Rulemaking .......................................................................5

   C.   Summary of Plaintiffs' Interests ......................................................................6

III.    STANDARD OF REVIEW .................................................................................9

IV.     ARGUMENT........................................................................................................9

   A.   Plaintiffs Have Standing to Pursue Each of the Claims Asserted....................9

      1.   The Grimm Declaration Should Be Disregarded. ..........................................9

      2.   Standing Requirements.................................................................................10

      3.   Plaintiffs Have Standing to Assert Claims Against NMFS Challenging the
           Adequacy of the Biological Opinion (Claims 1-4). .....................................11

      4.   Plaintiffs Have Standing to Challenge FEMA's De Facto Rule Amendment
           (Claims 5 & 6). .............................................................................................21

   B.   Claims 5 & 6 Challenge a Final Agency Action..........................................28

   C.   Claims 5 & 6 Are Ripe for Review. ..............................................................30

V.      CONCLUSION..................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Action Alliance of Senior Citizens v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986)................................................................................................30

*\*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000)........................................................................................28, 29

*Barrick Goldstrike Mines, Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000)...............................................................................................28

*\* Bennett v. Spear*,
520 U.S. 154 (1997).................................................10, 11, 16, 17, 18, 19, 20, 28

*Building Industry Ass'n of Superior California v. Babbitt*,
979 F. Supp. 893 (D.D.C. 1997)..........................................................................................10

*California Forestry Ass'n v. Thomas*,
936 F. Supp. 13 (D.D.C. 1996)...........................................................................................27

*Cement Kiln Recycling Coalition v. EPA*,
493 F.3d 207 (D.C. Cir. 2007).........................................................................................30, 31

*Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006).............................................................................................28

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986)..........................................................................................28-29

*Collins v. New York Central System*,
327 F.2d 880 (D.C. Cir. 1963).............................................................................................22

*\* CropLife America v. EPA*,
329 F.3d 876 (D.C. Cir. 2003)........................................................................................28, 30

*\* Dow AgroSciences LLC v. Nat'l Marine Fisheries Service*,
637 F.3d 259 (4th Cir. 2011)......................................................................................13, 17, 18

*Ferrer v. CareFirst, Inc.*,
No. 16-CV-02162 (APM), 2017 WL 3025839 (D.D.C. July 17, 2017)..............................9, 10, 17

*Florida Audubon Society v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996)..........................................................................................26, 27

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000)..........................................................................................................11

*General Electric Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002)....................................................................................22, 28

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987)....................................................................................10, 17

*Herbert v. Nat'l Academy of Sciences*,
974 F.2d 192 (D.C. Cir. 1992)..........................................................................................22

*Her Majesty the Queen in Right of Ontario v. EPA*,
912 F.2d 1525 (D.C. Cir. 1990)........................................................................................28

*Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Service*,
850 F. Supp. 886 (D. Or. 1994)........................................................................................13

*Iowa League of Cities v. EPA*,
711 F.3d 844 (8th Cir. 2013)......................................................................................23, 24

*Jermone Stevens Pharmaceuticals, Inc. v. FDA*,
402 F. 3d 1249 (D.C. Cir. 2005)........................................................................................9

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993)..........................................................................................................9

*Lujan v. Nat'l Wildlife Federation*,
497 U.S. 871 (1990)........................................................................................................26

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..............................................................................................11, 12, 24

*Nat'l Mining Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011)......................................................................22, 24, 29, 31

*Natural Resources Defense Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011)..........................................................................................28

*Oceana, Inc. v. Pritzker*,
125 F. Supp. 3d 232 (D.D.C. 2015)..................................................................................13

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998)........................................................................................................31

*Partnership for a Sustainable Future, Inc. v. U.S. Fish & Wildlife Service*,
No. 02-414, 2002 WL 33883548 (M.D. Fla. July 12, 2002)...................................................17, 20

*Sierra Club v. EPA*,
699 F.3d 530 (D.C. Cir. 2012)........................................................................................................25

*Sugar Cane Growers Cooperative of Florida v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)..........................................................................................................24

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013).......................................................................................22, 26, 27

**Statutes**

Administrative Procedure Act,
5 U.S.C. § 500 et seq.............................................................................................................1, 6, 23

Endangered Species Act,
16 U.S.C. §§ 1531 et seq.........................................................................................................2, 14

National Environmental Policy Act,
42 U.S.C. §§ 4321 et seq.....................................................................................................1, 6, 27

**Regulations**

40 C.F.R. § 1508.27(b)(3)...............................................................................................................27

44 C.F.R. § 60.3.................................................................................................................................5

44 C.F.R. § 60.3(a)(2)...............................................1, 5, 6, 18, 21, 23, 25, 26, 28, 29, 30, 31, 32

**Other Authorities**

41 Fed. Reg. 46, 961 (Oct. 26, 1976)...............................................................................................5

51 Fed. Reg. 19, 926 (June 3, 1986)...............................................................................................20

# I.   INTRODUCTION

Pursuant to Rule 7(b) of the Civil Rules of the United States District Court for the District of Columbia, Oregonians for Floodplain Protection, Oregon Home Builders Association ("OHBA"), and National Association of Home Builders ("NAHB") (collectively, "Plaintiffs") hereby submit this memorandum of points and authorities in opposition to Defendants' Motion to Dismiss and Memorandum in Support of Motion to Dismiss, filed September 8, 2017, ECF No. 18 ("Defs.' Mot. to Dismiss").  This Court has jurisdiction to resolve each of Plaintiffs' claims.  Plaintiffs have standing to challenge the National Marine Fisheries Service's ("NMFS") *Endangered Species Act (ESA) Section 7(a)(2) Jeopardy and Destruction or Adverse Modification of Critical Habitat Biological Opinion and Section 7(a)(2) "Not Likely to Adversely Affect" Determination for the Implementation of the National Flood Insurance Program in the State of Oregon* (the "Biological Opinion") because the Biological Opinion has caused, and will continue to cause, injury to Plaintiffs' property interests and Plaintiffs' interest in species conservation.  Plaintiffs also have standing to challenge the Federal Emergency Management Agency's ("FEMA") de facto amendment of 44 C.F.R. § 60.3(a)(2) as promulgated in violation of the Administrative Procedure Act, 5 U.S.C. § 500 et seq. ("APA"), and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), because the de facto rulemaking subjects Plaintiffs to additional regulatory obligations, and will impact the environment in the geographic area where Plaintiffs live, farm, and participate in recreational activities.  FEMA's de facto amendment is a final agency action, and thus, Plaintiffs' claims are ripe for resolution.

Defendants make bare assertions without legal support that Plaintiffs claims are not justiciable because FEMA has not yet implemented the reasonable and prudent alternative ("RPA") of the Biological Opinion.  Defendants misconstrue Plaintiffs' claims as well as binding

1

Supreme Court precedent to reach this conclusion.  Contrary to Defendants' assertions, the justiciability of any of Plaintiffs' claims ***does not*** depend on FEMA's implementation of the RPA.  Even so, FEMA has taken steps toward implementation and has committed to imminently take additional steps that also demonstrate the justiciability of Plaintiffs' claims.

## II.  STATEMENT OF THE FACTS

### A.  The Biological Opinion

On July 18, 2011, FEMA provided a letter to NMFS requesting formal consultation under the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), regarding the implementation of the National Flood Insurance Program ("NFIP") in the State of Oregon.  Defs.' Mot. to Dismiss Ex. 3 at 1, ECF No. 18-3.  FEMA initiated formal consultation with NMFS on August 15, 2012. *Id*. at 2.  As part of its consultation request, FEMA provided to NMFS its *Program Level Biological Assessment for the National Floodplain Insurance Program Oregon State* ("Biological Assessment") in February 2013.  Defs.' Mot. to Dismiss Ex. 7, ECF No. 18-7.

On April 14, 2016, NMFS issued the Biological Opinion, which determined that the implementation of the NFIP in Oregon as proposed by FEMA would jeopardize the survival and recovery of 16 of the 17 ESA-listed anadromous fish species considered in the Biological Opinion and Southern Resident killer whales, and would destroy or adversely modify the designated or proposed critical habitat for the 16 anadromous fish species.  Defs.' Mot. to Dismiss Ex. 3 at 1, ECF No. 18-3.  In response, NMFS issued the RPA and an Incidental Take Statement ("ITS").  *Id*. at 274-324.

The Biological Opinion includes deadlines for each element of the RPA.  The next deadline that FEMA must meet is only months away.  The Biological Opinion provides that, by

March 15, 2018, FEMA must implement RPA Element 2.[1]  *Id.* at 277.  RPA Element 2(A) directs FEMA to require that all development in the special flood hazard area ("SFHA") (also known as the 1% annual chance floodplain)[2] be mitigated to achieve no net loss of natural floodplain function, and sets forth several mitigation ratios for compensatory storage, vegetation removal, and placement of impervious surface applicable to development within the floodplain irrespective of the actual effects of the development.  *Id.* at 279.  Element 2(B) directs FEMA to require local jurisdictions to adopt a "riparian buffer zone" ("RBZ")[3] and to prohibit all development in the RBZ other than open space, habitat restoration, activities that result in a beneficial gain for the species or habitat, and activities that will have no adverse effects on listed species or habitat.  *Id.*  Further, Element 2 directs FEMA to revise its map revision procedures to decline all floodplain map amendment requests for which the applicant fails to demonstrate that all impacts of the proposed development to natural floodplain functions have been avoided or mitigated.  *Id.*

The Biological Opinion includes the ITS, which authorizes a certain amount of take of ESA-listed species incidental to the implementation of the NFIP in Oregon as long as certain "reasonable and prudent measures" are taken.  The reasonable and prudent measures in the ITS incorporate some of the requirements of the RPA, including that FEMA must monitor and report

---

[1] Additionally, the Biological Opinion sets January 1, 2021 as the deadline for implementation of any components of the RPA that FEMA determines require regulatory revisions, including Elements 3 and 4. Defs.' Mot. to Dismiss Ex. 3 at 277, ECF No. 18-3. Element 3 directs FEMA to revise its mapping protocols nationwide and to map erosion prone areas under the NFIP. Element 4 directs FEMA to modify the NFIP floodplain management criteria. *Id.* at 281-93.
[2] The SFHA is the area where the NFIP's floodplain management regulations must be enforced and the area where the mandatory purchase of flood insurance applies.
[3] The RBZ is the area within 170 feet horizontally from the ordinary high water mark of perennial or intermittent streams.

on floodplain development as described in RPA Elements 2 and 5.  Defs.' Mot. to Dismiss at

325, ECF No. 18-3.  The ITS also expressly provides that:

> . . . take in the form of harm from floodplain developments that is not otherwise
> exempted from ESA section 9 (*e.g.*, through a separate section 7 consultation or
> incidental take permit) and occurs prior to 2024 is <u>not</u> exempt from the section 9
> prohibition on take, unless the jurisdiction in which the development is occurring
> demonstrates to FEMA and NMFS that it has complied with RPA Element 2
> within 2 years of the date of this opinion, and, in the years thereafter, with the
> other RPA elements per the associated timelines.

*Id.* at 317.

On June 13, 2016, FEMA sent a letter to NFIP participating communities, informing

communities of their obligation to implement program changes by the March 15, 2018 deadline.

*See generally* Defs.' Mot. to Dismiss, Declaration of Michael Grimm ("Grimm Decl.") Ex. 1,

ECF No. 18-3.  The letter explained that NFIP-participating communities must either voluntarily

impose a "moratorium on all floodplain development that adversely impacts ESA listed species

or their habitat, or voluntarily implement the interim measures found in RPA Element 2."  *Id.* at

2.  In the summer of 2016, FEMA also gave a presentation to NFIP-participating communities

regarding the NFIP consultation in Oregon.  Declaration of Sarah Absher ("Absher Decl.") Ex.

A.  In this presentation, FEMA indicated that it will implement the RPA requirements or "search

for alternative methods of implementation to meet the overall goal of the RPA."  *Id.* at 11.

FEMA also stated that "[a]ll communities will be required to revise/adopt local regulations with

these more restrictive standards for development in the Floodplain" and that "[i]f communities

fail to comply with the RPA, FEMA will have no choice but to apply existing NFIP enforcement

actions."  *Id.* at 10.

On January 24, 2017, NMFS issued a clarification and errata to the RPA ("Errata") to

clarify questions that had been raised by Oregon communities regarding the RPA.  In the Errata,

4

NMFS explained that RPA Element 2(B), which is comprised of two use restrictions and two performance standards for development in the RBZ, was proposed by FEMA.  Defs.' Mot. to Dismiss Ex. 4 at 3-5; ECF No. 18-4.

## B.  FEMA's De Facto Rulemaking

FEMA established the existing "floodplain management criteria for flood-prone areas," 44 C.F.R. § 60.3, in 1976.  National Flood Insurance Program, 41 Fed. Reg. 46,961, 46,975 (Oct. 26, 1976).  44 C.F.R. § 60.3 outlines the requirements associated with each level of flood hazard analysis.  In particular, 44 C.F.R. § 60.3(a)(2) provides:

> . . . the community shall:. . . (2) Review proposed development to assure that ***all necessary permits*** have been received from those governmental agencies from which approval is required by Federal or State law, including section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334 . . . .

44 C.F.R. § 60.3(a)(2) (emphasis added).  44 C.F.R. § 60.3(a)(2) only requires applicants to demonstrate that they have "necessary permits" and there is no "necessary permit" under the ESA, as NMFS acknowledged in the Biological Opinion. Defs.' Mot. to Dismiss Ex. 3 at 40, ECF No. 18-3.

When FEMA issued the Biological Assessment in 2013, FEMA announced, and relied upon, a new interpretation of 44 C.F.R. § 60.3(a)(2), under which FEMA asserted that, under 44 C.F.R. § 60.3(a)(2), "NFIP communities must ensure that permit applicants have demonstrated compliance with ESA before issuing a floodplain development permit."  Defs.' Mot. to Dismiss Ex. 7 at 2-37, ECF No. 18-7.  At the time FEMA issued this pronouncement, FEMA found that "this clarification and application of the regulation do not warrant a change in the CFR or a reevaluation under NEPA."  *Id.* at 2-41.

### C.  Summary of Plaintiffs' Interests

Plaintiffs brought this action on June 15, 2017, pursuant to the ESA, APA and NEPA. Plaintiffs challenge NMFS' Biological Opinion as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  Plaintiffs also challenge FEMA's de facto amendment of 44 C.F.R. § 60.3(a)(2) as promulgated in violation of APA rulemaking procedures and NEPA.  FEMA violated the APA by failing to abide by the requirements of formal rulemaking when it imposed new legal obligations on NFIP-participating communities and floodplain development applicants by adopting a de facto amendment of 44 C.F.R. § 60.3(a)(2). FEMA also violated NEPA by failing to complete NEPA review prior to adopting this de facto amendment.

Plaintiffs include national and local industry trade associations, individual Oregon property owners, Oregon business owners, and NFIP-participating jurisdictions in Oregon. Plaintiffs' members live, work, own land, and partake in the diverse recreation available in the Oregon floodplain.  *See* Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 12, 15-17, ECF No. 1; *see, e.g.*, Declaration of Chad Allen ("Allen Decl.") ¶¶ 2, 14-16.  These members have also implemented, and plan to continue to implement, projects in the floodplain aimed at restoring and preserving habitat for ESA-listed anadromous fish species in Oregon.  Allen Decl. ¶¶ 14-16.

Plaintiffs' members have concrete plans to develop areas of the Oregon floodplain.  Mark Kujala owns properties and operates a business on properties that are mapped within the SFHA and portions of which are in the RBZ. Declaration of Mark Kujala ("Kujala Decl.") ¶¶ 4, 8, 10. Mr. Kujala plans to subdivide one property for residential development.  *Id.* ¶ 9.  He has already

invested time and money into preparing the land for subdivision and development by harvesting trees and preparing to grade the land for fill material. *Id.* ¶¶ 9, 11.

Daniel Watson owns and lives on property located within the SFHA in Albany, Oregon. Declaration of Daniel Watson ("Watson Decl.") ¶ 4. He has plans to add a master bedroom to his home and to install a covered arena for horses on the property. *Id.* ¶ 7. He also plans to subdivide a portion of his property to develop into a residential subdivision. *Id.* ¶ 8. Mr. Watson has invested time and money into developing his property. *Id.* ¶ 9. He completed a pre-application meeting with the City of Albany to plan subdivision of the eastern lot, anticipates filing a subdivision application within the next three months, and has had the property assessed for regional sewer truck line extensions. *Id.* ¶¶ 8, 9.

Plaintiffs' members also have a concrete interest in the preservation and conservation of the ESA-listed species addressed in the Biological Opinion. Mr. Watson is an active member of the Association of Northwest Steelheaders, which is dedicated to enhancing and protecting fisheries and their habitats. *Id.* ¶ 13. Chad Allen has improved the environment for threatened and endangered salmon species on the properties where he operates the Victor Dairy and other properties within Tillamook County. Allen Decl. ¶ 14. He is the Chair of the Tillamook Bay Flood Improvement District, which participated in the development of the Southern Flow Corridor Project to remove manmade impediments to flood flows in the lower Wilson and Trask River floodplains, in part, to improve habitat conditions for the threatened Coho salmon, and other salmonids, including chum and Chinook salmon, and cutthroat trout. *Id.* ¶ 16.

Plaintiffs' members also include NFIP-participating jurisdictions, including the City of Warrenton and Tillamook County, among others ("Plaintiff Jurisdictions"). Compl. ¶ 11. Plaintiff Jurisdictions have previously developed, are currently undertaking development, and

have planned development in the SFHA.  Declaration of Richard "Collin" Stelzig ("Stelzig Decl.") ¶¶ 7, 9-10, 13.  Approximately 80% of the developed land in the City of Warrenton is located in the SFHA.  *Id.* ¶ 5.  The City of Warrenton has adopted master plans, which plan for upgrading the Warrenton Marina and the Hammond Marina, portions of which are mapped within the RBZ and the floodway.  *Id.* ¶¶ 7-8, 12.  The City has already begun some upgrades, and has concrete plans to complete additional upgrades, such as adding a new recreational boat basin.  *Id.* ¶ 10.

Tillamook County and several of its agencies own or operate land or projects within the floodway or floodplain.  Absher Decl. ¶ 14.  In addition, Tillamook County is regularly reviewing development permit applications, such as the Blue Heron French Cheese Company, which the County does not believe have enough space on their properties to both fit the planned development and to satisfy RPA Element 2, which requires compensatory storage and other mitigation.  *Id.* ¶¶ 10-11.

The Plaintiff Jurisdictions have expended considerable staff resources in response to the requirements of the Biological Opinion.  *Id.* ¶ 13.  For example, Plaintiff Jurisdictions have participated in, and dedicated resources to, understanding the Biological Opinion and implementing the Biological Opinion, by attending workshops held by FEMA.  *Id.* ¶ 4; Stelzig Decl. ¶ 22.

Plaintiff Jurisdictions must take action to implement RPA Element 2 by March 2018 to satisfy the Biological Opinion's requirements and to maintain eligibility in the NFIP.  *See* Absher Decl. ¶ 22.  Plaintiff Jurisdictions will not have adequate time to meet this deadline under their standard process even if FEMA came out with its implementation plan today.  *Id.* For example, in Tillamook County, adoption of an ordinance amending the County's floodplain

regulations will require approximately six months, because the decision requires public hearings and review by the Planning Commission and the Board of Commissioners. *Id.* Therefore, to meet the requirements of the Biological Opinion, Plaintiff Jurisdictions will have to act in an emergency fashion to maintain eligibility for the NFIP. *Id.*

### III.  STANDARD OF REVIEW

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court must accept as true all the factual allegations in the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (citing *U.S. v. Gaubert*, 499 U.S. 315 (1991)).  The Court may consider materials outside of the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction. *See Jermone Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).  A plaintiff can augment its pleading with an affidavit that contains specific facts to support standing. *Ferrer v. CareFirst, Inc.*, No. 16-CV-02162 (APM), 2017 WL 3025839, at *2 (D.D.C. July 17, 2017*), reconsideration denied*, No. 16-CV-02162 (APM), 2017 WL 3491829 (D.D.C. Aug. 14, 2017) (citing *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987)).  A defendant, however, "is barred *at this stage of the proceedings* from attacking the claims made [in the complaint]." *Ferrer*, 2017 WL 3025839, at *2 (citing *Haase*, 835 F.2d at 907).  A defendant, therefore, cannot put forward evidence outside the pleadings to challenge a plaintiff's standing. *Ferrer*, 2017 WL 3025839, at *2 (citing *Haase*, 835 F.2d at 908).

### IV.  ARGUMENT

**A.  Plaintiffs Have Standing to Pursue Each of the Claims Asserted.**

1.  <u>The Grimm Declaration Should Be Disregarded.</u>

As a threshold matter, the Defendants' motion to dismiss must be denied because it is premised entirely on facts asserted in an affidavit attacking Plaintiffs' allegations set forth in the Complaint.  Compl. ¶¶ 84-91.  As the U.S. Court of Appeals for the D.C. Circuit has concluded, and this Court has recently reiterated, a defendant is barred from relying on such evidence to challenge a plaintiff's standing at this stage of the pleadings.  *Haase*, 835 F.2d at 908; *Ferrer*, 2017 WL 3025839, at *2. Yet, this is precisely what Defendants have done.  They rely upon the Grimm Declaration to allege that FEMA has not yet implemented the RPA, Grimm Decl. ¶¶ 9-10.  That allegation is the entire basis for their claim that Plaintiffs do not have standing.  *See, e.g.*, Defs.' Mot. to Dismiss at 20, ECF No. 18 ("[s]uch alleged injuries cannot suffice for purposes of standing, because FEMA has not yet done anything pursuant to the RPA to limit development on property located in floodplains . . . .").  This Court does not consider such evidence and should disregard the Grimm Declaration.  *Ferrer*, 2017 WL 3025839, at *2.  The Court should deny the Defendants' motion on these grounds.  In any event, as set forth below, Plaintiffs clearly have standing to bring the claims set forth in the Complaint.

2.  <u>Standing Requirements.</u>

To demonstrate Article III standing,[4] a plaintiff must meet three requirements: 1) it must have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to (or "caused" by) the challenged action of the defendant; and 3) it is likely, not speculative, that the injury will be

---

[4] Defendants do not assert that Plaintiffs' lack prudential standing.  It is nevertheless important to note that economic interests are clearly within the zone of interest protected by the ESA.  *Bennett v. Spear,* 520 U.S. 154, 176-177 (1997); *Bldg. Indus. Ass'n of Superior Cal. v. Babbitt*, 979 F. Supp. 893, 901 (D.D.C. 1997).  Here, as explained in Section IV.A.3, the Plaintiffs' economic interests are clearly imperiled by the challenged Biological Opinion.  Moreover, Plaintiffs' members also have a clear interest in preservation of the species subject to the Biological Opinion.

redressed by a favorable decision by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Bennett v. Spear,* 520 U.S. 154, 168 (1997) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Associations have standing to bring cases on behalf of individuals when "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[5] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (bracketed numbers added) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 33, 343 (1977)).

Defendants' standing argument boils down to bare assertions without legal support that Plaintiffs cannot meet the standing requirements because FEMA has not yet implemented the RPA in the Biological Opinion. This argument fails both with respect to Plaintiffs' claims against NMFS and with respect to Plaintiffs' claims against FEMA because (1) Plaintiffs' have already suffered redressable injury as a result of the Defendants' actions, and (2) implementation of the RPA is not required to confer standing on Plaintiffs.

3. Plaintiffs Have Standing to Assert Claims Against NMFS Challenging the Adequacy of the Biological Opinion (Claims 1-4).

   i. *Plaintiffs Have Suffered Injury-in-Fact.*

---

[5] Defendants' do not challenge Plaintiffs' ability to bring suit on behalf of their members; instead Defendants' assert that Plaintiffs' members would not have standing to sue in their own right because they have not suffered an injury-in-fact that would will be redressed by a favorable decision by the Court.

An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. at 560 (internal quotations and citation omitted).  Plaintiffs' Complaint and the declarations filed in support of this memorandum in opposition are replete with facts that demonstrate how Plaintiffs' members have already been harmed by the issuance of the Biological Opinion and demonstrate the imminent harm posed by the Biological Opinion.

First, the Biological Opinion is now harming and will continue to harm Plaintiffs' property values and ability to develop their properties.  *See, e.g.*, Kujala Decl. ¶ 7.  The Biological Opinion attributes jeopardy of ESA-listed species to floodplain development and calls for the restrictions on development in the floodplain.  Defs.' Mot. to Dismiss Ex. 3 at 146, ECF No. 18-3.  Regardless of whether such restrictions are ever actually implemented by FEMA, the Biological Opinion creates uncertainty with respect to future development in the floodplain. Kujala Decl. ¶ 7.  This has clouded Plaintiffs' properties, harmed Plaintiffs' property values and limited their ability to market their properties for development because (1) potential buyers are concerned that they will be subject to restrictions on development; and (2) potential buyers are on notice that their development may result in ESA liability because the Biological Opinion finds that floodplain development may cause take of ESA-listed species.  *Id*. ¶ 7; Absher Decl. ¶ 14. The injury is concrete and particularized to Plaintiffs' members because they own property in the floodplain and they have well established plans to develop that property or to market it for development purposes, as described in Section II.C above and in the accompanying declarations. *See, e.g.*, Kujala Decl. ¶¶ 7, 11; Stelzig Decl. ¶¶ 10, 20-21, Watson Decl. ¶¶ 8-9.  Even if FEMA decides against implementation of the Biological Opinion, the Biological Opinion will continue to harm Plaintiffs in the future in the same ways because it will stand as NMFS' final agency

action.  *See Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 269 (4th Cir.

2011) (holding "the [biological opinion] will stand as final agency action even after the EPA's

registration decision is issued, its effect will never be insignificant").

Second, the Biological Opinion is inadequate and harms Plaintiffs' interests in the

conservation of ESA-listed species.[6]  The Biological Opinion's effects analysis is based on

erroneous assumptions about the impacts from floodplain development and is not based on any

actual analysis of particular projects.  As a result, the Biological Opinion's assumptions about the

best methods for protecting the species and mitigating the impacts of the NFIP are inaccurate.

For example, the Biological Opinion proposes generic mitigation on a lot-by-lot basis, but does

not consider larger restoration efforts.  Watson Decl. ¶ 15.  As a result of the inaccurate analysis

in the Biological Opinion, the mitigation recommended may not lead to the recovery of the

species.  *Id*.  The injury caused by the inadequate Biological Opinion is particularized to

Plaintiffs because Plaintiffs' members have an interest in the conservation of the species

addressed in the Biological Opinion and have participated, and plan to continue participating, in

conservation projects for ESA-listed species habitat.  *See, e.g.*, Allen Decl. ¶ 14; *see Oceana,*

*Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015) (finding plaintiff had standing to

challenge biological opinion because plaintiff's members enjoyed observing and/or

studying listed species); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 850 F.

Supp. 886, 888 n.1 (D. Or. 1994) (finding plaintiff had standing to challenge biological opinion

because plaintiff had an interest in the listed species' recovery through its participation in captive

rearing, hatchery and recovery programs).

---

[6] Plaintiffs' development interests are not at odds with their conservation interests.  The
Biological Opinion, by incorrectly attributing jeopardy to floodplain development, imposes
overbroad mitigation and inadequately protects ESA-listed species.

Third, the Biological Opinion has already injured Plaintiff Jurisdictions by imposing additional resource and regulatory strain on Plaintiff Jurisdictions.  The Biological Opinion calls for the participation of Plaintiff Jurisdictions to implement the RPA by March 2018 through development restrictions.  ESA issues are not normally handled at a local permitting counter and Plaintiff Jurisdictions do not have the expertise necessary to handle ESA compliance matters.  Therefore, Plaintiff Jurisdictions have been required to expend considerable staff resources to understand the Biological Opinion and to respond to FEMA's preliminary efforts at implementation.  Absher Decl. ¶ 13; Stelzig Decl. ¶ 22.  For example, in June and July of 2016, FEMA held workshops with local governments, including Plaintiff Jurisdictions, to determine how to implement the RPA.  Defs.' Mot. to Dismiss at 14-15, ECF No. 18; Absher Decl. ¶¶ 4, 13.

Fourth, elements of the RPA are directly applicable to the Plaintiff Jurisdictions through the Biological Opinion's ITS.  Thus, the Biological Opinion imposes additional regulatory burdens on Plaintiff Jurisdictions if they seek to avoid liability for take associated with development within their jurisdictions.  Under the ESA, any person who knowingly "takes" an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment.  *See* 16 U.S.C. §§ 1540(a) and (b) (authorizing civil fines of up to $25,000 per violation and criminal penalties of up to $50,000 and imprisonment for one year).  Here, the ITS in the Biological Opinion provides that:

> . . . take in the form of harm from floodplain developments that is not otherwise exempted from ESA section 9 (*e.g.*, through a separate section 7 consultation or incidental take permit) and occurs prior to 2024 is not exempt from the section 9 prohibition on take, unless the *jurisdiction in which the development is occurring demonstrates to FEMA and NMFS that it has complied with RPA Element 2 within 2 years of the date of this opinion.* . . .

14

Defs.' Mot. to Dismiss Ex. 3 at 317, ECF No. 18-3 (emphasis added).  This statement plainly demonstrates that the Plaintiff Jurisdictions will be unable to rely on the ITS to provide a safe harbor for any take that may result from issuing a development permit if they do not demonstrate compliance with RPA Element 2 by the March 15, 2018 deadline.  NMFS considers the issuance of floodplain development permits that do not avoid or compensate for detrimental impacts on ESA-listed species as noncompliant with the ESA.  Grimm Decl. Ex. 1 at 1, ECF No. 18-1.  Therefore, as a practical matter and as recognized by FEMA in public documents, if the Plaintiff Jurisdictions wish to avoid civil and criminal penalties, they must comply with the terms and conditions of the RPA now or impose a moratorium on development in the floodplain to avoid unauthorized take.  *Id.* at 2.

Fifth, *additional* injury to Plaintiffs from the Biological Opinion is imminent because the deadline for implementation of RPA Element 2 is now only months away in March 2018.  Defs.' Mot. to Dismiss Ex. 3 at 277, ECF No. 18-3.  In fact, FEMA must take action before this RPA deadline because all changes to regulations, policies, procedures, and/or guidance as needed to implement this RPA must be in place by that deadline.  *Id.*  To maintain NFIP eligibility, NFIP-participating jurisdictions must adopt such regulations and policies in conformance with any decision FEMA makes.  *Id.* at 288.  Plaintiff Jurisdictions need time (at least six months) to adopt ordinances implementing RPA Element 2.  Absher Decl. ¶ 22.  This means that FEMA will need to make a final decision on its RPA Element 2 implementation *now* if it is going to meet the March 2018 deadline.

When RPA Element 2 is implemented, it will significantly affect whether and how Plaintiffs develop their properties because, for example, it restricts development in the RBZ and requires mitigation of development in the SFHA.  As explained above, regardless of how FEMA

implements RPA Element 2, Plaintiffs have advanced plans for development projects that will have to conform to the way that FEMA decides to implement RPA Element 2; this will change how the projects are implemented, the project costs, and threatens the viability of the projects. *See, e.g.*, Kujala Decl. ¶¶ 10-12; Allen Decl. ¶¶ 9-12; Watson Decl. ¶ 12. This harm is real. It is not speculative and it is not dependent on FEMA's formal and complete implementation of RPA Element 2.

In a factually analogous case, the Supreme Court found that the issuance of a biological opinion alone was sufficient to confer standing against the Government. In *Bennett*, the Supreme Court considered whether irrigation districts had standing to challenge a biological opinion issued by the U.S. Fish and Wildlife Service ("FWS") pertaining to the impacts of a federal irrigation project on ESA-listed species. The biological opinion concluded that the project's long-term operation was likely to jeopardize the continued existence of certain endangered fish, and FWS identified an RPA to avoid jeopardy, including maintenance of minimum water levels on certain reservoirs. *Bennett*, 520 U.S. at 157-59. The biological opinion also included an incidental take statement. *Id.* The Supreme Court found that the petitioner irrigation districts had sufficiently alleged injury-in-fact by asserting that the biological opinion imposed restrictions on lake levels that would adversely affect petitioners by substantially reducing the quantity of available irrigation water, even though those restrictions had not yet been implemented by the action agency. *Id*. at 167. As in *Bennett*, the Biological Opinion here finds that development within the floodplain, such as that proposed and pursued by Plaintiffs' members, jeopardizes listed fish species, and imposes an RPA to avoid jeopardy. Moreover, as in *Bennett*, the Biological Opinion calls for restrictions which directly impact Plaintiffs' interest, *i.e.*, their ability to develop their floodplain properties.

Defendants claim that Plaintiffs risk no imminent injury because FEMA has not yet clearly stated whether or not it will implement the RPA (and attempt to distinguish *Bennett*) on this basis.[7]  This ignores the reality that action agencies almost never disregard a biological opinion because of its coercive effects.  *Id*. at 168-70.  As acknowledged and explained in *Bennett*, a biological opinion has a strong coercive effect on the action agency because:

> [t]he action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for "any person" who knowingly "takes" an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment.

*Id*. at 170 (citing 16 U.S.C. §§ 1540(a) and (b)).  Although the action agency in *Bennett* had indicated intent to implement the RPA, the *Bennett* holding was not premised on this fact.  Rather, *Bennett* is grounded on the legal consequences that flow from a biological opinion.  The Court's decision focused on the strong coercive effect of the biological opinion.  *See Bennett*, 520 U.S. at 168-70.

Other courts have expanded upon this principle and have made clear that a biological opinion's legal consequences predominate over the action agency's position on compliance.  For example, in *Dow AgroSciences*, pesticide manufacturers challenged a biological opinion on the registration of pesticides by the Environmental Protection Agency ("EPA").  637 F.3d at 269. The EPA had advised the FWS by letter that it intended to implement only some of the FWS's proposed label changes and to adopt its own buffer requirements, which EPA stated would accomplish the FWS's goals.  The district court found that the biological opinion was not reviewable because EPA had not yet acted on the biological opinion.  The U.S. Court of Appeals

---

[7] Defendants' factual assertions regarding FEMA's lack of implementation of the Biological Opinion used to rebut Plaintiffs' claims of injury are not properly considered at this stage. *Haase* forbids a defendant from assuming the correctness of its legal theory and offering its own evidence to negate a plaintiff's alleged injury.  835 F.2d at 910; *Ferrer*, 2017 WL 3025839, at *2.

for the Fourth Circuit reversed, holding that the biological opinion was reviewable based on the biological opinion's coercive effect. *See also P'ship for a Sustainable Future, Inc. v. U.S. Fish & Wildlife Serv.*, No. 02-414, 2002 WL 33883548, at *3 (M.D. Fla. July 12, 2002) (rejecting the argument that no legal consequences flowed from the biological opinion at issue until the U.S. Army Corps of Engineers issued a fill permit required by the federal Clean Water Act).

Furthermore, Defendants' position on compliance with the RPA is really no different than the action agencies' positions in *Bennett* and *Dow AgroSciences*. Defendants' motion recognizes FEMA's intent to comply with the deadlines to implement RPA Element 2. Defs.' Mot. to Dismiss at 14, 19, ECF No. 18. FEMA does not deny its intent to implement any sub-elements of the RPA that it ***does*** have the authority to implement. *Id*. at 14. In fact, FEMA must believe that it has the authority to implement, at a minimum, RPA Element 2(B) because FEMA proposed this element. Defs.' Mot. to Dismiss Ex. 4 at 3, ECF No. 18-4. Furthermore, FEMA's own documents indicate that it will proceed with certain elements of the RPA. For example, a FEMA PowerPoint presentation to local jurisdictions states that "[a]ll 251 Affected Communities will be remapped based on higher standards." Absher Decl. Ex. A at 10. Implementation of any element of the RPA will harm Plaintiffs by requiring Plaintiff Jurisdictions to change their regulatory programs or face removal from the NFIP, *id.*, and by imposing additional requirements on development in floodplains where Plaintiffs' members' properties are located. The downstream effects of any implementation of the Biological Opinion on property owners through regulatory changes made by local jurisdictions are also imminent because local jurisdictions will have to implement RPA Element 2 immediately under FEMA's reinterpretation of 44 C.F.R. § 60.3(a)(2) and to avail themselves of the safe harbor of the ITS.

ii.   *Plaintiffs' Injuries Are Fairly Traceable to NMFS' Issuance of the Biological Opinion.*

Many of Plaintiffs' injuries result directly from the Biological Opinion, such as the immediate impacts to property values attributable to the uncertainty caused by the Biological Opinion, the harm to Plaintiffs' interest in the conservation of the species due to the inadequate Biological Opinion and related mitigation, and the additional regulatory burden imposed on Plaintiff Jurisdictions through the ITS.  Thus, those injuries are directly attributable to NMFS' actions.

Other injuries will result from FEMA's implementation of the Biological Opinion and from the ultimate development criteria that NFIP-participating jurisdictions must adopt.  These injuries are directly traceable to NMFS through its issuance of the Biological Opinion.  The Supreme Court has conclusively resolved that in order for an injury to be "fairly traceable" to a defendant, the actions of the defendant *do not* have to be the very last step in the chain of causation.  *Bennett*, 520 U.S. at 168-69.  In *Bennett*, the government argued that "the proximate cause of [the petitioners'] harm is an (as yet unidentified) decision by the Bureau regarding the volume of water allocated to petitioners, not the biological opinion itself."  *Id*. at 168.  The Supreme Court rejected this argument, noting that it "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."  *Id.* at 169.  The Court acknowledged that the ESA presupposes that the biological opinion will play a central role in the action agency's decision-making process.  *Id.*

As in *Bennett*, Plaintiffs' injuries that result from the implementation of the RPA are fairly traceable to NMFS' Biological Opinion even though the Biological Opinion is not the very last step in the chain of causation because the Biological Opinion coerces FEMA's

implementation of the RPA.  Here, while local jurisdictions must take the additional step of

adopting land use policies to implement the Biological Opinion, it does not alter the applicability

of *Bennett*.  Local jurisdictions are subject to the Biological Opinion's coercive effects in the

same manner as FEMA and the outcome of that coercion is direct harm to the Plaintiffs.  As

FEMA has stated, "[a]ll communities will be required to revise/adopt local regulations with these

more restrictive standards for development in the Floodplain" and that "[i]f communities fail to

comply with the RPA, FEMA will have no choice but to apply existing NFIP enforcement

actions."  Absher Decl. Ex. A at 10.

    iii.  *Plaintiffs' Injuries Are Redressable.*

  *Bennett* also establishes that Plaintiffs' injuries will be redressed by a favorable judicial

ruling.  520 U.S. at 171*;see also P'ship for a Sustainable Future, Inc.*, 2002 WL 33883548, at *3

(finding redressability requirement met where plaintiff challenged a biological opinion even

though action agency had not taken final action). If the Biological Opinion is set aside, Plaintiffs'

injuries will be redressed because (1) it will eliminate the uncertainty that is diminishing the

value of Plaintiffs' properties; (2) NMFS will have to revisit its analysis of the NFIP's effects on

ESA-listed species; and (3) Plaintiff Jurisdictions will not have to expend more resources to

respond to the Biological Opinion.  Further, if the Biological Opinion is set aside, Plaintiffs'

imminent injuries from the implementation of the RPA will also be redressed because the

Biological Opinion plays a central role in FEMA's decision-making process.  *Bennett*, 520 U.S.

at 169 (quoting Intragency Cooperation—Endangered Species Act of 1973, as Amended; Final

Rule, 51 Fed. Reg. 19,926, 19,928 (June 3, 1986)).  Because FEMA has not previously required

these restrictive development standards in its implementation of the NFIP, there is no reason to

believe it would continue to do so if the Biological Opinion were set aside.

4. <u>Plaintiffs Have Standing to Challenge FEMA's De Facto Rule Amendment (Claims 5 & 6).</u>

Plaintiffs have suffered a redressable injury from FEMA's reinterpretation of 44 C.F.R. § 60.3(a)(2) without compliance with APA rulemaking requirements and NEPA.  FEMA announced a reinterpretation of 44 C.F.R. § 60.3(a)(2) when it issued the Biological Assessment. *See* Defs.' Mot. to Dismiss Ex. 7 at 2-40 - 2-41, ECF No. 18-7.  The plain language of 44 C.F.R. § 60.3(a)(2) requires NFIP-participating communities to assure that any proposed development has "all necessary permits."  The plain language of the regulation does not require demonstration of compliance with the ESA because there is no "necessary" ESA permit.  NMFS itself has acknowledged that permits are not required by the ESA:

> FEMA proposes to proceed with NFIP enforcement under 44 CFR 59.24 when a community fails to adequately enforce the floodplain management regulations, including the "necessary permits" regulation (44 CFR 60.3(a)(2)). A significant flaw in this aspect of FEMA's proposed action is the reliance on local entities "complying with the ESA" prior to issuing a floodplain development permit.

Defs.' Mot. to Dismiss Ex. 3 at 40, ECF No. 18-3.  FEMA's past interpretation of the regulation was consistent with the plain language as demonstrated by the fact that FEMA did not enforce any failure by NFIP-participating jurisdictions to assure ESA compliance.  FEMA's Biological Assessment even acknowledged that NFIP-participating jurisdictions had not previously assured compliance with the ESA.  *See* Defs.' Mot. Decl. Ex. 7 at 2-40, ECF No. 18-7 ("Past implementation efforts by local jurisdictions concentrated only on checking for USACE permits to demonstrate compliance with the federal permit requirements.").

When it issued the Biological Assessment, FEMA announced a new, binding interpretation of 44 C.F.R. § 60.3(a)(2) under which NFIP Participating Communities would have to assure that development permit applicants have complied with the ESA.  The

21

pronouncement plainly states "participating communities are *required* to address compliance with the ESA prior to issuance of their floodplain development permit." *Id.* (emphasis added); *see Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("Our cases likewise make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding[.]").[8]

      i.   *Plaintiffs Have Standing to Bring an APA Challenge to the De Facto Rulemaking.*

      a.   Plaintiffs Have Suffered Injury-in-Fact Due to FEMA's Failure to Comply with the APA.

Plaintiffs suffered procedural injury when FEMA issued its de facto rulemaking without complying with the APA. Plaintiffs alleging procedural injury need only show that they have a procedural right that, if exercised, could protect their concrete interest. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). As this court has previously recognized, when the procedural injury arises from a de facto rulemaking, as here, a rule need not be applied to Plaintiffs specifically in order for Plaintiffs to have suffered an injury. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011) (rejecting defendants argument that plaintiff failed to establish the requisite injury-in-fact prong of the test for standing because it has not shown that its members have suffered a particularized and concrete injury traceable to rule pronouncements).

---

[8] Insofar as FEMA asserts that the de facto rulemaking is not binding or not a change in agency position and the Court is inclined to agree with FEMA on this issue, the court should wait until it adjudicates the merits of those claims to resolve the jurisdictional issue. *See Herbert*, 974 F.2d at 198 ("[T]hough the trial court may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard[.]"). This Court has previously indicated that ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction. *Collins v. N.Y. Cent. Sys.*, 327 F.2d 880 (D.C. Cir. 1963).

Under the APA, rule adoption or revision is required to follow specific notice and comment procedures. 5 U.S.C. § 553.1.  Therefore, Plaintiffs were entitled to comment on FEMA's reinterpretation of 44 C.F.R. § 60.3(a)(2) under the APA.  Plaintiffs' procedural rights to participate in rulemaking by providing comments as part of APA rulemaking could have protected Plaintiff Jurisdictions' concrete underlying interest in maintaining their current level of regulatory responsibility, maintaining eligibility under the NFIP under the current criteria, and in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them.  *See Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013) ("[plaintiff's] members have a concrete interest not only in being able to meet their regulatory responsibilities but in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them").  FEMA's de facto amendment of 44 C.F.R. § 60.3(a)(2) harms Plaintiff Jurisdictions by imposing the additional eligibility requirement of finding that development permit applicants have complied with the ESA.  If Plaintiff Jurisdictions do not impose these new requirements they may be subject to removal from the NFIP.   In addition, determining whether each development permit applicant is ESA compliant is beyond the Plaintiff Jurisdictions' technical expertise and imposes increased compliance costs on jurisdictions.  Absher Decl. ¶ 13.

The de facto amendment also harms Plaintiffs' members who own property and who seek to develop their property because it imposes new and more restrictive development permit standards than were previously imposed.  If Plaintiffs' had the opportunity to provide comment, such comments may have persuaded FEMA that a narrower interpretation was more appropriate.  Therefore, Plaintiffs were denied the opportunity to protect their concrete interests in maintaining existing regulatory obligations applicable to both the Plaintiff Jurisdictions and

Plaintiffs' members who seek development permits from NFIP-participating jurisdictions.  On

this basis, Plaintiffs have suffered an injury-in-fact from FEMA's de facto rulemaking.  *See Nat'l*

*Mining Ass'n*, 768 F. Supp. 2d at 47 (additional process created by EPA de facto rulemakings

caused plaintiffs concrete and particularized injury); *Iowa League of Cities*, 711 F.3d at 871.

> b.   Plaintiffs' Injuries Are Traceable to the De Facto Rulemaking.

Where a challenger is the subject of agency action, "there is ordinarily little question that

the action . . . has caused him injury, and that a judgment preventing . . . the action will redress

it."  *Lujan v. Defs. of Wildlife*, 504 U.S. at 561-62.  The traceability requirement is met because

Plaintiff Jurisdictions and Plaintiffs' members who seek development permits from NFIP-

participating jurisdictions are the subject of FEMA's de facto amendment: the de facto

amendment requires Plaintiff Jurisdictions to require development permit applicants to

demonstrate ESA compliance.

> c.   Plaintiffs' Injuries Are Redressable.

With respect to redressability, "[t]he person who has been accorded a procedural right to

protect his concrete interests can assert that right without meeting all the normal standards for

redressability and immediacy."  *Id*. at 572 n.7.  Redressability in the context of procedural injury

does not require Plaintiffs to show that the agency would alter its rules upon following the proper

procedures.  *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C.Cir. 2002)

("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA

had to show that its comment would have altered the agency's rule, section 553 would be a dead

letter.").

There is no doubt that Plaintiffs' injury from the de facto rulemaking can be redressed if

the court vacates the new rule and reinstates the agency's previous practice.  If the court vacates

the illegal rule modification, it would redress these injuries by allowing continued use of the current regulatory approach taken by Plaintiff Jurisdictions. *See Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C.Cir. 2012) ("Having shown its members' redressable concrete interest, [a petitioner association] can assert violation of the APA's notice-and-comment requirements, as those procedures are plainly designed to protect the sort of interest alleged.").

      ii.   *Plaintiffs Have Standing to Bring a NEPA Challenge to the De Facto Rulemaking.*

        a.   Plaintiffs Have Suffered Injury-in-Fact Due to FEMA's Failure to Comply With NEPA When Issuing the De Facto Rulemaking.

Plaintiffs suffer a procedural injury due to FEMA's failure to comply with NEPA.[9] FEMA's failure to conduct a NEPA analysis deprived Plaintiffs of the opportunity to participate in the NEPA process and protect their interests in the preservation of agricultural land outside of the floodplain. NEPA requires federal agencies to assess the impacts of federal actions that significantly affect the quality of the human environment. FEMA's implementation of its de facto amendment to 44 C.F.R. § 60.3(a)(2) constitutes a major federal action significantly affecting the quality of the human environment. In violation of NEPA, FEMA did not prepare an environmental impact statement, finding of no significant impact, environmental assessment, or rely on an exemption prior to taking this action. Thus, Plaintiffs' have suffered a procedural

---

[9] Plaintiffs anticipate that Defendant FEMA may attempt to cite to its Draft Nationwide Programmatic Environmental Impact Statement, issued in March 2017, and claim that its proposed reinterpretation of 44 C.F.R. ¶ 60.3(a)(2) does not result in any significant impacts to agricultural land or other land use types. That analysis, however, is premised on the erroneous assertion that FEMA has previously required local jurisdictions to require floodplain development permit applicants to demonstrate compliance with the ESA. As explained herein, Plaintiffs contest that assertion and instead state that FEMA has recently changed its implementation of 44 C.F.R. ¶ 60.3(a)(2).

injury.  *WildEarth Guardians,* 738 F.3d at 305 (agency's failure to prepare EIS is "archetypal procedural injury.")

In order to invoke judicial review of an alleged NEPA violation under the APA, a plaintiff must be "adversely affected or aggrieved ... within the meaning" of NEPA by some final agency action.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 882-83.  To demonstrate standing in a procedural challenge to NEPA, "a plaintiff must show a causal connection between the challenged change in federal regulation—and the incremental environmental effect the new regulation would allegedly cause—and the alleged injury to the particularized interests of the plaintiff."  *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (citing *City of Los Angeles v. Nat'l Highway Traffic Safety Admin*, 912 F.2d 478, 483-84 (D.C.Cir. 1990)).

As explained in Section IV.B below, the de facto rulemaking is a final agency action.  The change in 44 C.F.R. § 60.3(a)(2) will cause a significant environmental effect because it will discourage development in the floodplain by making the barrier to floodplain development higher.  This will in turn increase the development in areas outside of the floodplain.  One aspect of the environment that this additional development outside of the floodplain will harm is agricultural lands.  Plaintiff Jurisdictions and other Plaintiff members have a particularized interest in limiting the transfer of development from within the floodplain to areas adjacent to the floodplain, including agricultural lands.  Absher Decl. ¶ 19.  For Plaintiff Jurisdictions, there are agricultural lands within their jurisdictions and agriculture is a key element of their culture.  *Id*.  For other Plaintiff members, the resulting urban development will limit the agricultural land on which they can conduct their agricultural practices, such as dairy farming, because city's and county's will need to expand their urban growth boundaries into agricultural lands to accommodate development that otherwise could have occurred in developed areas of the

floodplain.  Absher Decl. ¶ 20.  For Chad Allen, this will impact his continued operation of

Victor Dairy which is operated on agricultural lands.  Allen Decl. ¶ 21.  It is not speculative that

jurisdictions will expand urban growth areas into agricultural areas in response to limitations of

floodplain development.  Absher Decl. ¶ 20.  *Contrast with Cal. Forestry Ass'n v. Thomas*, 936

F. Supp. 13, 19 (D.D.C. 1996) (injury from issuance of guidance was too speculative where it

depended on natural course of forest health).  Plaintiffs' injury is within the zone-of-interest

protected by NEPA because the impact of a federal action on farmlands is an important factor

under NEPA.  40 C.F.R. § 1508.27(b)(3).

   b. Plaintiffs' Injuries Are Traceable to the De Facto Rulemaking Without

    Compliance With NEPA.

  "To prove causation, a plaintiff seeking the preparation of an EIS must demonstrate that

the particularized injury that the plaintiff is suffering or is likely to suffer is fairly traceable to the

agency action that implicated the need for an EIS."  *Fla. Audubon Soc'y*, 94 F.3d at 669.  The

injury that Plaintiffs are likely to suffer—loss of agricultural lands—is fairly traceable to the de

facto rulemaking because the de facto rulemaking makes development in the floodplain more

difficult, thereby pushing development out of the floodplain into undeveloped lands, such as

agricultural lands.

   c. Plaintiffs' Injuries Are Redressable.

  When procedural injuries are alleged, the redressability requirement is relaxed.  *See

WildEarth Guardians*, 738 F.3d at 305.  Plaintiffs' injuries are redressable because if FEMA had

prepared an EIS, it would have been required to consider the impact of the rulemaking on

farmlands, 40 C.F.R. § 1508.27(b)(3), which may have impacted FEMA's decision to require

local jurisdictions to find that all floodplain development permits comply with the ESA.

### B.  Claims 5 & 6 Challenge a Final Agency Action.

Defendants' finality arguments focus solely on FEMA's purported lack of RPA implementation, and fail to provide any legal authority for the proposition that a de facto rule amendment is not a final agency action.  For agency action to be final and, thus, subject to judicial review, it must (i) mark "the consummation of the agency's decision-making process . . . [and] not be of a merely tentative or interlocutory nature;" and (ii) "be one by which rights or obligations have been determined or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177-78 (internal quotation marks and citations omitted).  Notably, an "agency's adoption of a binding norm obviously would reflect final agency action."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006).

The pronouncement in the Biological Assessment reflects FEMA's settled and final position regarding the interpretation of 44 C.F.R. § 60.3(a)(2).  In the Biological Assessment, FEMA made express findings that it does not need to go through notice and comment rulemaking or comply with NEPA with respect to the reinterpretation, which signals that FEMA considered its action to be final.  *See* Defs.' Mot. to Dismiss Ex. 7 at 2-41, ECF No. 18-7 ("FEMA believes this clarification and application of the regulation do not warrant a change in the CFR or a reevaluation under NEPA").  Defendants cite a string of cases holding that biological assessments do not constitute final agency actions.  This misses the point.  Plaintiffs do not challenge the Biological Assessment itself, but rather FEMA's pronouncement of the de facto rule recited therein.[10]

---

[10] Documents found to constitute legislative rules include agency letters, announcements, press releases, and/or guidance documents.  *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011); *CropLife Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003); *Gen. Elec. Co. v. EPA*, 290 F.3d 377; *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000); *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000); *Her Majesty the Queen in*

The pronouncement in the Biological Assessment is a binding norm because it is phrased as a requirement: "NFIP communities must ensure that permit applicants have demonstrated compliance with ESA before issuing a floodplain development permit." Defs.' Mot. to Dismiss Ex. 7 at 2-37, ECF No. 18-7. There are significant legal consequences to NFIP participating jurisdictions and development permit applicants in those jurisdictions associated with FEMA's reinterpretation of 44 C.F.R. § 60.3(a)(2). This new rule results in wholesale changes to the Plaintiff Jurisdictions' regulatory obligations. The RPA need not be implemented, nor permitting decisions made pursuant to the reinterpretation, for legal consequences to flow from the de facto rulemaking.

The D.C. Circuit has addressed factually analogous situations and found that the finality requirement is met in each of those situations. In *National Mining Ass'n*, the plaintiff brought suits against the EPA pursuant to the APA, challenging a series of memoranda and a detailed guidance released by the EPA, which the plaintiff claimed imposed substantive changes to a Clean Water Act permitting process and created a new level of permit review. 768 F. Supp. 2d 34. EPA asserted that none of the EPA's actions qualified as a final agency action within the meaning of the APA because they did not mark the grant or denial of the various permits at issue. The court disagreed, finding that the defendant's conception of "finality is too narrow, as it is possible for an agency to take final agency actions during a permit assessment process prior to actually determining whether to grant or deny an application for a permit." *Id.* at 44.

Similarly, in *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000), utilities alleged that an EPA guidance document imposed unauthorized requirements on states in connection with the operation of permit programs under the Clean Air Act. EPA argued that the

---

*Right of Ontario v. EPA*, 912 F.2d 1525 (D.C. Cir. 1990); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34.

guidance was not a final agency action.  *Id.* at 1020.  The D.C. Circuit rejected this argument, concluding that "the [g]uidance, insofar as relevant here, is final agency action, reflecting settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain [Clean Air Act] permits in order to continue operating."  *Id.* at 1023.  *See also CropLife Am.*, 329 F.3d 876 (finding that EPA's publication of a press release that changed the established practice of relying on third-party studies was a final agency action).  As in each of those cases, the finality requirement is also met here.

**C.  Claims 5 & 6 Are Ripe for Review.**

Claims 5 and 6 are pure legal challenges to FEMA's de facto rulemaking through its reinterpretation of 44 C.F.R. § 60.3(a)(2).  In assessing ripeness, the Court must evaluate the fitness of the issues for judicial decision by considering "whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position."  *Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C. Cir. 1986) (citing *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92-93 (D.C. Cir. 1986)).  "[W]hen a challenge to an agency document as a 'legislative rule is largely a legal, not a factual, question'—that is, when it turns only on whether the document 'on its face ... purports to bind both applicants and the Agency with the force of law'—the claim is fit for review."  *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 216 (D.C. Cir. 2007)(citing *Gen. Elec. Co.*, 290 F.3d at 380).

Defendant's ripeness arguments focus solely on FEMA's purported lack of implementation of the RPA, but Plaintiffs' claims challenging FEMA's failure to abide by APA rulemaking requirements and NEPA requirements when issuing a de facto rule are unrelated to

RPA implementation.  The claims related to the de facto amendment satisfy the ripeness

requirements.  First, as explained above, Defendants' pronouncement of a reinterpretation of 44

C.F.R. § 60.3(a)(2) in the Biological Assessment is a final agency action.  The Court need look

no further than the face of page 2-40 of the Biological Assessment to determine that FEMA's

pronouncement purports to bind the Plaintiffs and the agency.  Defs.' Mot. to Dismiss Ex. 7 at 2-

40,  ECF No. 18-7.  Second, the de facto rulemaking claims present primarily, if not purely, legal

questions for which further factual development or administrative action in the context of the

implementation of the RPA is unnecessary.  *See Cement Kiln Recycling Coal.*, 493 F.3d at 215

(explaining that it is "well-established that claims that an agency's action is . . . contrary to law

present purely legal issues . . . [s]o, too, do claims that an agency violated the APA by failing to

provide notice and opportunity for comment") (internal quotations omitted).  The *National*

*Mining Ass'n* court addressed this issue, and determined that the plaintiff's claims that certain

EPA pronouncements constituted unlawful legislative rules were ripe for judicial decision,

without regard for fact specific implementation or application in permitting decisions, because

the plaintiffs were challenging the process of adoption as unlawful.  768 F. Supp. 2d 34.  As in

*National Mining Ass'n*, no further factual development or administrative action would clarify

these issues because Plaintiffs challenge ***the process*** by which the de facto rule was adopted,

which concluded with the pronouncement in the Biological Assessment.

 For the same reason, Plaintiffs' NEPA claim is ripe for review.  "[A] person with

standing who is injured by a failure to comply with the NEPA procedure may complain of that

failure at the time the failure takes place, for the claim can never get riper."  *Ohio Forestry*

*Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998).  Defendants' mischaracterize the Complaint

as asserting a NEPA violation for "inaction," which does not trigger NEPA.  They are wrong.

FEMA's NEPA violation derives from its de facto amendment of 44 C.F.R. § 60.3(a)(2), as pronounced in various documents, including the Biological Assessment.  Plaintiffs' NEPA claim pertaining to this FEMA action is subject to review.

## V.  CONCLUSION

Defendants' motion to dismiss should be denied because Defendants' argument is premised on evidence, which is not properly considered at this stage of the litigation. Furthermore, Plaintiffs have clearly demonstrated standing because (1) they are harmed directly by the Biological Opinion; (2) FEMA has, in fact, taken steps to implement the RPA, which harms Plaintiffs; and (3) Plaintiffs have suffered procedural injuries from FEMA's de facto amendment of 44 C.F.R. § 60.3(a)(2), which are tied to their concrete interests.  Finally, the ripeness and finality requirements are met with respect to FEMA's de facto rulemaking because the de facto rulemaking is an action from which legal consequences flow and Plaintiffs' claims raise purely legal issues that are presumptively ripe for review.


Dated this 22nd day of September 2017.


Respectfully submitted,


*/s/ Molly Lawrence*
Molly Lawrence (WSBA Bar # 28236)
Michael D. Farber (D.C. Bar # 449215)
Van Ness Feldman LLP
1050 Thomas Jefferson St., N.W.
Washington, D.C. 20007
Telephone: (202) 298-1800
Facsimile: (202) 338-2416
mol@vnf.com
mfarber@vnf.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2017, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.


_/s/Molly Lawrence_
Molly Lawrence