| | |
|---|---|
| OREGONIANS FOR FLOODPLAIN PROTECTION, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 17-cv-1179 (RJL) ) |
| THE U.S. DEPARTMENT OF COMMERCE, *et al.*, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**
(September **19**, 2018) [Dkts ## 18, 27]

Before the Court is a motion to dismiss by defendants for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and plaintiffs' motion to strike defendants' notice of supplemental facts. Defs.' Mot. to Dismiss [Dkt # 18] ("Defs.' Mot."); Pls.' Mot. to Strike [Dkt # 27] ("Pls.' Mot."). In these motions, the parties dispute whether or not plaintiffs have standing to challenge the Federal Emergency Management Agency's ("FEMA") implementation of the National Marine Fisheries Service's ("NMFS") reasonable and prudent alternative ("RPA") to FEMA's administration of the National Flood Insurance Program ("NFIP") in Oregon. Upon due consideration of the parties' pleadings, the relevant law, and the entire record herein, I find that plaintiffs lack standing to bring this suit and, accordingly, defendants' motion to dismiss [Dkt # 18] is GRANTED, plaintiffs' motion to strike [Dkt # 27] is DENIED, and the case is DISMISSED.

1

## BACKGROUND

Plaintiffs bring this suit against the U.S. Department of Commerce ("DOC"), the National Marine Fisheries Service ("NMFS"), and the Federal Emergency Management Agency ("FEMA"), challenging the implementation of NMFS's reasonable and prudent alternative ("RPA") to FEMA's administration of the National Flood Insurance Program ("NFIP") in participating Oregon communities. Plaintiffs allege violations of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2) (2012), 50 C.F.R. §§ 402.02, 402.14(g)–(h) (2018), the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706 (2012), and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2) (2012), 40 C.F.R. §§ 1502.14, 1508.9(b) (2018). *See* Compl. [Dkt #1] ¶¶ 92-127.

### A. Regulatory Landscape

FEMA has administered the National Flood Insurance Program ("NFIP") since 1968. 42 U.S.C. § 4001 *et seq.*[1] Under the NFIP, Congress authorized the director of FEMA to carry out a "program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States." 42 U.S.C. § 4011(a) (2012). Importantly, FEMA's authority under the program is limited. *See* Defs.' Mot. at 3 (citing 42 U.S.C. § 4022(a)(1) (2012); 44 C.F.R. § 60.1(a) (2018)). Congress provided that "[t]he Director shall make flood insurance available in *only* those States or areas"

---

[1] The NFIP was subsequently modified in 1983 (Pub. L. 98-181, Title IV, § 451(d)(1), (2)), 1994 (Pub. L. 103-325, Title V, § 555(a)), 2004 (Pub. L. 108-264, Title I, § 105(a)), and 2012 (Pub. L. 112-141).

which he has determined have (1) evidenced a "positive interest" in securing flood insurance under the NFIP and (2) implemented adequate land use or control measures. *Id.* (emphasis added). Those States or areas are, for purposes of the statute, described as "participating communities." *Id.* As such, flood insurance is only available in communities that have adopted floodplain management criteria consistent with FEMA's regulations. 42 U.S.C. § 4022(a)(1); 44 C.F.R. § 60.1(a). Property owners in those "participating communities" are able to go through FEMA to purchase insurance protection against flooding. FEMA itself therefore has no actual land use authority under the statute; it is merely authorized to administer the NFIP and to set minimum floodplain management criteria. *See* 44 C.F.R. § 60.1–.26.

The National Environmental Policy Act imposes procedural requirements on federal agencies to consider the environmental impact of certain federal actions prior to making decisions, through the generation of an Environmental Assessment ("EA") and, if determined to be necessary by the agency, an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4321 *et seq.* ("NEPA"). Where the agency determines that an EIS is not required, it must issue a "finding of no significant impact" ("FONSI"), explaining why its action will not have a significant impact on the human environment. *See* 40 C.F.R. §§ 1501.4(e), 1508.13 (2018).

Where there is a concern that its actions may jeopardize endangered species, FEMA —like other action agencies—may seek either an informal or formal consultation with NMFS or FWS under Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2). A formal ESA consultation requires the consulting agencies to evaluate FEMA's proposed actions so as

3

to determine whether they are likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary...to be critical..." *Id.* To that effect, NMFS or FWS will issue a Biological Opinion advising the requesting agency whether its actions will result in any adverse effects. Where listed species are likely to be jeopardized or critical habitat is likely to be destroyed or adversely modified, NMFS recommends "reasonable and prudent alternatives"—actions that are constituent with the intended purpose of the action, within the agency's authority to implement, economically and technologically feasible, and will avoid jeopardy and/or adverse modification of critical habitat. 50 C.F.R. § 402.02. FEMA then has a period of time to implement the NMFS's recommendations under the RPAs.

### B. Procedural History

This case does not arise from FEMA's ordinary administration of the NFIP, but from a private settlement between FEMA and environmental groups in July 2010. *See* Compl. ¶ 60; Defs.' Mot. Exhibit 2, Settlement Agreement, *Audubon Soc'y of Portland v. FEMA,* Case No. 3:09-cv-729-HA (D. Or.) (hereinafter "Settlement Agreement") ¶¶ 1, 2. Pursuant to the terms of that settlement, on August 15, 2012, FEMA agreed to initiate formal Section 7 consultation with NMFS regarding the implementation of the NFIP in the State of Oregon. *See* Settlement Agreement ¶ 2. Specifically, FEMA requested review of its *Program Level Biological Assessment for the National Floodplain Insurance Program Oregon State* ("Biological Assessment"). Compl. ¶ 61.

On April 24, 2016, after four years of drafting its own Biological Opinion pursuant

4

to Section 7, *see* Defs.' Mot. Exh. 3, *Endangered Species Act (ESA) Section 7(a)(2) Jeopardy and Destruction or Adverse Modification of Critical Habitat Biological Opinion* ("Biological Opinion"), NMFS issued findings on the impact of the NFIP in Oregon on 17 ESA-listed anadromous fish species and the Southern Resident killer whale, and determined that FEMA's administration of the NFIP in Oregon would jeopardize 16 of those species. Compl. ¶ 62. Consequently, NMFS recommended that FEMA adopt a reasonable and prudent alternative ("RPA") to its proposed implementation of the NFIP. *Id.* ¶ 63.[2]

The RPA is broken down into six elements. *Id.* Element 1 directs FEMA to notify participating NFIP communities in Oregon about NMFS's conclusions. *Id.* Element 2 directs it to implement "Interim Measures" in advance of fully implementing the RPAs. *Id.* Element 3 directs FEMA to revise its mapping protocols under the NFIP to account for erosion prone areas. *Id.* Element 4 directs FEMA to modify its floodplain management criteria to adopt an "ESA performance standard." *Id.* Element 5 directs FEMA to collect data from NFIP participating communities and to use that data to document the environmental impacts of floodplain development. *Id.* And, finally, Element 6 directs FEMA to enforce the new floodplain management criteria in NFIP communities. *Id.*

NMFS originally suggested staggered deadlines for implementation of the substantive elements: Elements 2 and 5 and Sub-elements 3.A and 3.E by March 15, 2018,

---

[2] NMFS issued a clarification and errata to the RPA on January 24, 2017. *See* Defs.' Mot. at 12, n. 2.

5

Element 4 by January 1, 2019, Sub-elements 3.B, 3.D, 3.F, and 3.G by September 15, 2019, and January 1, 2021 for any components of the RPA that require regulatory revisions. NMFS called for full compliance by September 1, 2024. *See* Compl. ¶ 64; Defs.' Mot. at 13–14; Biological Opinion (Defs.' Mot. Ex. 3) at 277.

In keeping with Element 1, FEMA issued notice letters to participating communities on June 13, 2016. Compl. ¶ 85. However, FEMA has expressed some concerns over its legal authority to implement certain aspects of the RPA, *id.* ¶ 75 (citing FEMA letters to NMFS), and is still in the process of developing an implementation plan for the other RPA elements. *Id.* ¶¶ 86–91.

Plaintiffs brought suit on June 15, 2017, alleging injury arising from NMFS's issuance and FEMA's application of the RPA, which plaintiffs allege is outside the scope of FEMA's authority under the NFIP and could constrain the implementation of the NFIP in participating Oregon communities.

This case is now before me upon consideration of defendants' motion to dismiss, which was filed September 8, 2017. Subsequent to the briefing on the motion to dismiss, defendants filed a supplemental notice of facts with this Court representing that, at the earliest, a final implementation plan for the RPA would not be adopted until August 2018 if FEMA issues a Finding of No Significant Impact ("FONSI") and an Environmental Assessment ("EA"). *See* Defs.' Notice of Suppl. Facts [Dkt # 25] at 2. If FEMA instead determines that a full Environmental Impact Statement ("EIS") and Record of Decision ("ROD") are required, defendants state that FEMA will likely not adopt a final implementation plan until March 2019. *See id.* FEMA notified NMFS of this anticipated

6

delay on February 1, 2018. *See id.*

Plaintiffs have moved to strike defendants' notice of supplemental facts, arguing among other things that it presents facts immaterial to this Court's review of the motion to dismiss. *See generally* Pls.' Mot. Given the overlapping and potentially dispositive issues in these two motions, I will address both herein.

## STANDARD OF REVIEW

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed for lack of subject matter jurisdiction if the action is not a "case" or "controversy" under Article III of the Constitution. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). "Three inter-related judicial doctrines—standing, mootness, and ripeness, ensure that federal courts assert jurisdiction only over '[c]ases' and '[c]ontroversies'" consistent with their constitutional authority under Article III. *Worth v. Jackson*, 451 F.3d 854, 855 (D.C. Cir. 2006).

Standing under Article III requires that "plaintiff[s] must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 149 (2010); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).

Irrespective of whether or not plaintiffs have alleged an injury that is cognizable under Article III, the doctrine of ripeness prevents courts from "entangling themselves in

7

abstract disagreements over administrative policies" absent an "administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs v. Gardner*, 387 U.S. 136, 148–49 (1967); *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 364 (D.C. Cir. 2005) ("In ascertaining whether a suit is ripe, courts must balance the plaintiff's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting."). These are the jurisdictional principles that I must apply to plaintiffs' claims in this case.

## ANALYSIS

### I. Plaintiffs Lack Article III Standing to Bring This Challenge to FEMA's Implementation of the RPA

All of plaintiffs' claims essentially boil down to this: the RPA is *ultra vires* and arbitrary and capricious. Plaintiffs allege a number of grounds requiring me to order NMFS to withdraw the RPA and enjoin FEMA's implementation. For one, plaintiffs allege that NMFS did not adequately consider relevant factors in performing its Section 7 analysis under the ESA, *see* Compl. ¶¶ 92–97 (Counts 1 and 2), and relied on an incorrect baseline, *see id.* ¶ 99 (Count 3). Plaintiffs further allege that the RPA, as written, "impose[s] on FEMA requirements that exceed FEMA's legal authority and jurisdiction." *See id.* ¶ 109 (Count 4). And finally, plaintiffs allege that FEMA's implementation of the RPA would constitute a *de facto* rulemaking in violation of NEPA, 42 U.S.C. § 4321, and the APA, 5 U.S.C. § 500, because plaintiffs have had no opportunity to participate in notice and

8

comment. *See id.* ¶¶ 115-127 (Counts 5 and 6). Unfortunately for plaintiffs, their allegations of harm do not get very far because they fail at the injury prong of the Article III standing analysis. How so?

First, plaintiffs do not allege any substantive injury. To be sure, plaintiffs state that "NFIP participating community members are being coerced to limit development within their floodplains by the Biological Opinion and FEMA's current and ongoing implementation of the RPA," *id.* ¶ 11, but they fail to back that up with examples of any specific limitations on development or indeed any changes to FEMA's policy on development whatsoever.

As to any procedural injury, plaintiffs cannot show that FEMA's implementation of the RPA "will cause a distinct risk to a particularized interest of the plaintiff." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc); *see also id.* at 670 (holding that environmentalists did not establish an injury resulting from defendant's actions because of "the presence and number of third party links in the causal chain"). It is true that plaintiffs may demonstrate standing in certain circumstances by alleging procedural, as well as substantive, injuries, where "[t]he procedural...is tied to their respective members' concrete aesthetic and recreational interests." *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (explaining that organizations had standing to challenge the procedural inadequacy of a decision where the local pollution that caused their members' aesthetic injuries followed inexorably from the government's decision). Yet "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id.* at 305 (citing *Summers v. Earth Island Inst.*, 555

9

U.S. 488, 497 (2009)) (internal quotation marks omitted). In other words, "a procedural right *in vacuo*…is insufficient to create Article III standing." *Summers,* 555 U.S. at 496.

Plaintiffs' concerns for how the administration of NFIP will change *if* FEMA implements the RPA and *if* FEMA's implementation of the RPA constitutes a *de facto* amendment of 44 C.F.R. § 60.3(a)(2) do not rise to the level of a cognizable injury-in-fact. And until FEMA issues either a ROD or an FEIS, the Court has no basis upon which to instruct NMFS or FEMA to act differently. Accordingly, absent an injury-in-fact to date, plaintiffs lack the necessary standing to proceed with this suit as to all of their claims.

## II. Plaintiffs' Challenge to FEMA's Implementation of the RPA is not Ripe

For the same reasons, plaintiffs' challenge to FEMA's implementation of the RPA (Counts 5 and 6) is also not ripe. For a claim to be ripe under Article III, the plaintiff must establish constitutional minima akin to that of standing by showing an injury-in-fact. *Nat'l Treasury Emp. Union v. United States,* 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending."); *see also Wyo. Outdoor Council v. U.S. Forest Service,* 165 F.3d 43, 50 (D.C. Cir. 1999) (explaining that a future threat to resources was not ripe unless and until the definitive leases were issued).

As such, allegations of possible future injury do not satisfy these requirements. This injury in fact must be "certainly impending." *Wyo. Outdoor Council,* 165 F.3d at 48 (quoting *Nat'l Treasury Emp. Union,* 101 F.3d at 1427). To determine if a challenge to an administrative action is ripe for review, the Court must consider three factors: "(1) whether

10

delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 364 (D.C. Cir. 2005) (characterizing these as *two* factors: "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration").

Applying these factors here further militates against adjudication of plaintiffs' alleged injury at this time. As made clear in defendants' notice of supplemental facts, FEMA has not yet even begun implementing the RPA aside from sending notice letters to participating communities on June 13, 2016. Defs.' Notice of Suppl. Facts at 2. Plaintiffs insist that this Court should not credit the supplemental evidence defendants have presented to show the delayed implementation of the RPA, arguing instead that plaintiffs' claims against FEMA "are not premised on FEMA's implementation of the RPA," Pls.' Mot. at 1–2, but on the "procedural injury…resulting from FEMA's unlawful de facto rulemaking." *Id.* at 3. I disagree.

Here, the "biological assessment" issued by FEMA cannot be considered a *de facto* rulemaking because defendants have expressly acknowledged that it is *not final*. *See* Defs.' Mem. in Opp'n. of Mot. to Strike [Dkt # 28] at 3; Defs.' Mot. at 30–32. Indeed, plaintiffs *concede* that defendants have yet to issue a FONSI (or alternatively, a ROD)—the next step in the well-established rulemaking process. Pls.' Mem. in Opp'n. to Defs.' Mot. to Dismiss [Dkt #19] at 25. And it is the law of our Circuit that the issuance of a ROD or

11

FONSI would be necessary to constitute final agency action. *See, e.g., Stand Up for California! v. U.S. Dept. of Interior*, 298 F. Supp. 3d 136, 151 (D.C. Cir. 2018) (dismissing plaintiff's jurisdictional arguments because the "Record of Decision was final..."); *Citizens Ass'n of Georgetown v. Fed. Aviation Admin.*, 886 F.3d 130, 137 (D.C. Cir. 2018) (finding that the FONSI/ROD was the FAA's final decision because it "marked the consummation of the agency's decision making process and was a source of legal consequences"); *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017) (determining that the "issuance of a ROD constitutes final agency action" making plaintiff's claim ripe for review). Plaintiffs have cited no authority to the contrary.[3]

For all of these reasons, the Court would clearly "benefit from further factual development of the issues presented" and to interfere before issuance of FEMA's final agency action would "inappropriately interfere with further administrative action." *Ohio Forestry Ass'n*, 523 U.S. at 735. As for whether delayed review will cause irreparable harm to the plaintiffs, it will not. *See id.* The bottom line is thus clear: plaintiffs have not alleged to date any ongoing, concrete injury arising from FEMA's implementation of the RPA.[4]

---

[3] Indeed, our Circuit has "repeatedly held that agency action is not final if the adverse effects of the action depend 'on the contingency of future administrative action.'" *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1032 (D.C. Cir. 2016) (internal citations omitted).

[4] Finally, I disagree with plaintiffs' assertion that "[r]eliance on facts outside the complaint to challenge standing is impermissible." Pls.' Mot. at 3. Indeed, on a motion to dismiss under Rule 12(b)(1), "[a] defendant may make a factual attack on the Court's subject matter jurisdiction ... as opposed to a facial attack based solely on the complaint." *Finca Santa Elena*, 873 F. Supp. 2d at 368. Where defendants mount a factual attack on jurisdiction—as they do here—"no presumption of truthfulness applies to the factual allegations" in

12

Considering the supplemental facts submitted by defendants which anticipate a delay until 2019 to fully implement the RPA, I find that Claims 5 and 6 are also not ripe, thus furnishing an independent basis for dismissal of these two claims.

## CONCLUSION

Thus, for all of the foregoing reasons, plaintiffs' Motion to Strike [Dkt # 27] is DENIED, defendant's Motion to Dismiss [Dkt # 18] is GRANTED, and the case is DISMISSED for lack of standing and ripeness. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

plaintiffs' complaint. *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 232 (D.D.C. 2007) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). I am therefore "not obliged to accept [plaintiffs'] allegations as true and may examine evidence to the contrary and reach [my] own conclusion on the matter." *Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 368 (quoting 5B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure: Civil* § 1350, 159–198 (3d ed. 2004)). For these reasons, I deny plaintiffs' motion to strike defendants' notice of supplemental facts.